FILED

2019 MAR -6  PM 4:13

U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | INDICTMENT |
| ) | |
| Plaintiff, ) | 1:19 CR 147 |
| ) | |
| v. ) | CASE NO.:_____ |
| ) | Title 18, United States Code, |
| JOSEPH P. GRAY, JR., ) | Sections 922(g)(1), |
| MALCOLM GIBSON, ) | 924(c)(1)(A), and 2; Title 21, |
| SAMUEL GIBSON, ) | United States Code, Sections |
| MARK EVANS, ) | 841(a)(1), (b)(1)(A), (b)(1)(B), |
| WESTLEY SIGGERS, ) | (b)(1)(C), 843(b), and 846 |
| RAQWAN OFIELD, ) | |
| PAUL BELL, ) | JUDGE ADAMS |
| LARRY JACKSON, ) | |
| RICKY JACKSON, ) | |
| BRENDAN CRAIG, ) | |
| AARON CROSBY, ) | |
| CHINO MASSEY, ) | |
| SHONDELL MACK, ) | |
| LEJON KIDD, JR., ) | |
| DA'EON GRAY, ) | |
| AMINAH COLVIN, ) | |
| SHANITA JENNINGS, ) | |
| LEANNA NABULSI, ) | |
| GEORGE SALEM, ) | |
| JEFFREY AUVIL, ) | |
| WILLIAM BLOOMFIELD, ) | |
| CHRISTINA GORDENIER, ) | |
| ) | |
| Defendants. ) | |

## COUNT 1

(Conspiracy to Possess with Intent to Distribute and to Distribute Controlled Substances,
21 U.S.C. §§ 841(a)(1), (b)(1)(A), (b)(1)(B), and (b)(1)(C), in violation of 21 U.S.C. § 846)

The Grand Jury charges:

1.      From in or around January 2018 to on or about March 6, 2019, in the Northern

District of Ohio, Eastern Division, and elsewhere, Defendants JOSEPH P. GRAY, JR.,

MALCOLM GIBSON, SAMUEL GIBSON, MARK EVANS, WESTLEY SIGGERS,

RAQWAN OFIELD, PAUL BELL, LARRY JACKSON, RICKY JACKSON, BRENDAN

CRAIG, AARON CROSBY, CHINO MASSEY, SHONDELL MACK, LEJON KIDD, JR.,

DA'EON GRAY, AMINAH COLVIN, SHANITA JENNINGS, LEANNA NABULSI,

GEORGE SALEM, and JEFFREY AUVIL did knowingly and intentionally combine, conspire,

confederate, and agree together and with each other and with others known and unknown to the

Grand Jury, to possess with intent to distribute and to distribute at least the following quantities

of the following controlled substances, in violation of Title 21, United States Code, Sections

841(a)(1), (b)(1)(A), (b)(1)(B), and (b)(1)(C):

        a.      400 grams or more of a mixture and substance containing a detectable

amount of fentanyl, a Schedule II controlled substance;

        b.      100 grams or more of a mixture and substance containing a detectable

amount of one or more fentanyl analogues, that is: carfentanil, a Schedule I controlled substance;

acetylfentanyl, a Schedule I controlled substance cyclopropyl fentanyl, a Schedule I controlled

substance; phenyl fentanyl, a Schedule I controlled substance; and 4-ANPP, a Schedule II

controlled substance;

        c.      100 grams or more of a mixture and substance containing a detectable

amount of heroin, a Schedule I controlled substance;

d.      280 grams or more of a mixture and substance containing a detectable amount of cocaine base, a Schedule II controlled substance;

e.      A detectable amount of cocaine, a Schedule II controlled substance; and

f.      A detectable amount of methamphetamine, a Schedule II controlled substance.

<u>MANNER AND MEANS OF THE CONSPIRACY</u>

2.      It was part of the conspiracy that:

a.      JOSEPH GRAY led a drug trafficking organization (the "DTO") that sold a variety of controlled substances, primarily heroin, fentanyl, fentanyl analogues, cocaine base (also known as crack cocaine), and cocaine.  The DTO concentrated on customers on the east side of Cleveland, Ohio, including nearby suburbs like Euclid, Ohio, and locations in Lake County, Ohio.  The DTO also served customers coming in from out of town.

b.      JOSEPH GRAY coordinated co-conspirators' efforts (i) to communicate with one another to determine when they were running low on drugs, (ii) to obtain bulk quantities of drugs from suppliers, and (iii) to re-sell those drugs to their customers.

c.      Co-conspirators used cellular telephones to make and receive telephone calls, and to send and receive text or other electronic messages to conduct their drug trafficking activity.  To reduce the risk of being detected by law enforcement, and to conceal the identity of the person using the device, co-conspirators often used cellular telephones that had been obtained in the names of other persons or in fictitious names.  Co-conspirators, when using cellular phones or text messaging to conduct drug trafficking activity, used slang terms, street terminology, or code words or phrases to obscure and to disguise the true nature of their activities and the true meaning of their conversations.

d.      Co-conspirators discussed sales of purported heroin and purported cocaine when in fact the "heroin" co-conspirators sold was generally fentanyl, fentanyl analogues, and mixtures of heroin with fentanyl and fentanyl analogues.  Similarly, the "cocaine" that co-conspirators sold was more often crack cocaine.

e.      EVANS, MALCOLM GIBSON, SAMUEL GIBSON, and others obtained large quantities of controlled substances, primarily heroin product, sometimes selling directly to drug users and also coordinating with JOSEPH GRAY and other co-conspirators to provide the DTO with bulk quantities of those substances for the co-conspirators to resell to the larger DTO customer base.  SAMUEL GIBSON often operated as a broker between JOSEPH GRAY and EVANS and MALCOLM GIBSON.

f.      Co-conspirators sold to regular customers who knew them and their respective contact information, and they also used a single shared telephone and telephone line that was available to all customers (the "Customer Phone").  By passing the Customer Phone from co-conspirator to co-conspirator, the DTO could operate at all hours, and customers could reliably obtain drugs from the DTO at any time.  JOSEPH GRAY and the other co-conspirators told their customers that the Customer Phone was a 24-hour-a-day operation.

g.      JOSEPH GRAY was the primary operator of the Customer Phone, but OFIELD, PAUL BELL, LARRY JACKSON, CRAIG, CROSBY, MACK, and others also operated the Customer Phone, serving as the point of contact for the DTO's larger customer base.

h.      SIGGERS, OFIELD, LARRY JACKSON, RICKY JACKSON, CROSBY, MASSEY, KIDD, DA'EON GRAY, and other co-conspirators primarily sold to their own

customer bases, but coordinated with GRAY and other co-conspirators to keep an inventory of drugs available for sale and to replenish their supplies when they ran low or ran out.

        i.     JOSEPH GRAY and other co-conspirators discussed not keeping a large inventory on hand because of the legal and financial risks of large purchases.  The DTO generally re-supplied in smaller quantities, but did so frequently, sometimes on a daily basis. JOSEPH GRAY, MASSEY, OFIELD, CROSBY, SAMUEL GIBSON, and others obtained re-supply for the DTO from EVANS, MALCOLM GIBSON, and other sources of supply.

        j.     Both expressly and using coded language, co-conspirators directed customers to specific locations where the customers knew co-conspirators would meet to sell drugs, including, but not limited to, the following locations in the greater Cleveland, Ohio, area: a residence on Arcade Avenue in Cleveland, Ohio ("Arcade" or the "A"); a residence on Huntmere Avenue in Cleveland, Ohio ("Huntmere" or the "Mere"); the Family Dollar Store on East 185th Street, in Cleveland, Ohio (the "Family Dollar"); and the intersection of East 246th Street and Ellsworth Avenue in Euclid, Ohio ("246" or "2-4-6").

        k.     Co-conspirators accepted payments from customers in cash, in in-kind services in the form of labor, indirect payments through purchases of gasoline or other goods, and through digital payment services providers, such as "Cash App," a mobile device-based application through which individuals can send money from person to person.

        l.     Co-conspirators met at a commercial property on Holmes Avenue in Cleveland, Ohio (the "Shop").  Co-conspirators used the Shop as a centralized location to conduct drug trafficking activities, including weighing and packaging drugs for sale, conducting drug transactions, and counting and dividing up cash drug trafficking proceeds.

m.     DA'EON GRAY served as the proprietor of the Shop, maintaining the Shop and making it available to co-conspirators and associates to make sales to customers and to coordinate their other drug trafficking activities.

n.     JOSEPH GRAY, DA'EON GRAY, and other co-conspirators possessed and used firearms or other weapons to protect their drug trafficking activities.

o.     Co-conspirators used counter-surveillance maneuvers in order to avoid surveillance by law enforcement when using vehicles for their trafficking activities.

p.     EVANS was particularly conscious of law enforcement and used counter-surveillance maneuvers both to avoid surveillance and to determine whether law enforcement officers were watching him.  When EVANS perceived that he was being followed, he dropped his phone, changing both his phone and phone number.

q.     KIDD operated as a marijuana dealer outside the DTO, but worked with the DTO to sell heroin, cocaine, and crack cocaine, and traded marijuana for other controlled substances.

r.     Male co-conspirators used female co-conspirators, including NABULSI, JENNINGS, and COLVIN, to act as their nominees in financial and commercial transactions in order to evade detection and identification by law enforcement, such as renting vehicles in female co-conspirators' names for male co-conspirators to drive.

s.     NABULSI, SALEM, and AUVIL obtained drugs from the DTO for redistribution to third parties.  NABULSI and AUVIL also promoted the DTO with potential customers.

## ACTS IN FURTHERANCE OF THE CONSPIRACY

3.      In furtherance of the conspiracy, and to effect the objects and conceal the existence thereof, Defendants and others performed acts in the Northern District of Ohio, Eastern Division, and elsewhere, including, but not limited to, the following:

4.      On or about January 8, 2018, in a silver Ford F-150 parked at a Motel 6 in Willoughby, Ohio, SIGGERS possessed the following controlled substances: 6.06 grams of cocaine and 4.37 grams of a mixture of heroin, carfentanil (a fentanyl analogue), and cocaine.

5.      On or about June 6, 2018, in Wickliffe, Ohio, SIGGERS sold a mixture of heroin, fentanyl, and fentanyl analogues to Victim 1, Person 1, and Person 2, and Victim 1 overdosed on the mixture that SIGGERS sold him.

6.      On or about June 6, 2018, in Wickliffe, Ohio and elsewhere, SIGGERS attempted to flee from police when officers attempted to stop him.

7.      On or about June 6, 2018, in Wickliffe, Ohio, Cleveland, Ohio, and elsewhere, SIGGERS possessed the following controlled substances: 12.33 grams of a mixture of fentanyl analogues (cyclopropyl fentanyl, phenyl fentanyl and 4-ANPP); 4.75 grams of cocaine; 17.27 grams of a mixture of fentanyl analogues (cyclopropyl fentanyl, phenyl fentanyl, 4-ANPP), heroin, and cocaine; residue of a mixture of fentanyl analogues (cyclopropyl fentanyl, phenyl fentanyl and 4-ANPP); and residue of heroin.

8.      On or about August 6, 2018, in Cleveland, Ohio, DA'EON GRAY possessed two loaded firearms (a stolen Smith & Wesson, Model SD9VE, 9mm caliber semi-automatic pistol, bearing serial number FWF0258, loaded with 17 rounds of 9mm caliber ammunition; and a Smith & Wesson, MP40, .40 caliber semi-automatic pistol, bearing serial number HMJ5075, loaded with 16 rounds of .40 caliber ammunition), a box of 9mm caliber ammunition, a bag of .40 caliber ammunition, 6 boxes of .223 caliber ammunition, 5 cellular telephones, $1,756.50 in

U.S. currency, and the following controlled substances: 1.56 grams of crack cocaine; 1.22 grams of a mixture of heroin, fentanyl, and cocaine; and 0.13 grams of a mixture of fentanyl, 4-ANPP, and tramadol.

9.      On or about August 14, 2018, at a gas station in Cleveland, Ohio, JOSEPH GRAY and CRAIG sold a person cooperating with law enforcement (the "CS") 0.14 grams of a mixture of fentanyl, cocaine, and tramadol for $40.

10.      In or around August 2018, JENNINGS rented a yellow Hyundai vehicle for JOSEPH GRAY to use for the DTO's trafficking activities.

11.      On or about August 15, 2018, at a gas station in Cleveland, Ohio, while using the yellow Hyundai vehicle JENNINGS had rented, JOSEPH GRAY and CRAIG sold the CS 0.18 grams of a mixture of fentanyl and tramadol for $50.

12.      On or about August 17, 2018, at a gas station on East 185th Street, Cleveland, Ohio, while using the yellow Hyundai vehicle JENNINGS had rented, JOSEPH GRAY and CRAIG sold the CS 0.07 grams of a mixture of fentanyl, methoxyacetylfentanyl (a fentanyl analogue), heroin, and tramadol for $30, and sold the CS 0.12 grams of cocaine base for $20.

13.      On or about on August 21, 2018, at approximately 8:16 p.m., LARRY JACKSON, using a recorded line in the Cuyahoga County Jail, called JOSEPH GRAY on the telephone.  During the conversation, LARRY JACKSON said he had "a lot of s--t going on. Who got the phone [the Customer Phone]?"  JOSEPH GRAY responded, "Yeah I just gave him some dope baby, I mean I just gave him some.  He cool, he cool.  He got the phone [Customer Phone], and I just gave him some.  He cool [the unspecified male has what he needs: drugs and the Customer Phone]."  JOSEPH GRAY also told LARRY JACKSON, "I got a lot.  I got a lot [of drug supply]," and that the unspecified male was "at my lady's house."  At LARRY

JACKSON's request, JOSEPH GRAY called RICKY JACKSON and merged that call with LARRY JACKSON for a three-way call. During that part of the conversation, RICKY JACKSON began by confirming it was LARRY JACKSON on the line, asking, "CITY [LARRY JACKSON's nickname]?" LARRY JACKSON responded, "Yeah," and asked, "RICKY, where you at?" RICKY JACKSON explained that he was on East 185th Street in Cleveland, Ohio. LARRY JACKSON told RICKY JACKSON that he needed RICKY JACKSON to "come downtown" to get his car because he had "6,000 [dollars] in this car down here and it's sitting down here [I need you to get my car because I am incarcerated, and there is $6,000 in the car]."

14.     On or about August 29, 2018, in Wickliffe, Ohio, BELL possessed the following controlled substances: 1.33 grams of a mixture of heroin, fentanyl, and cocaine; and 0.73 grams of cocaine.

15.     On or about September 6, 2018, in Euclid, Ohio, JOSEPH GRAY attempted to flee from police when officers attempted to stop him.

16.     On or about September 18, 2018, in the morning hours, at a gas station in Cleveland, Ohio, BELL sold the CS 2.46 grams of a mixture of fentanyl, acetylfentanyl (a fentanyl analogue), and heroin, and 0.03 grams of cocaine for $285.

17.     On or about September 18, 2018, at approximately 12:10 p.m., JOSEPH GRAY, using a recorded line in the Cuyahoga County Sheriff's Office satellite jail located in Euclid, Ohio, after twice attempting to call the Customer Phone, called COLVIN on the telephone. During the conversation, at JOSEPH GRAY's request, COLVIN called BELL and merged that call with JOSEPH GRAY for a three-way call. During that part of the conversation, JOSEPH GRAY began by asking, "CUZ [BELL's nickname], why you can't answer the phone?" BELL responded by explaining that the call showed up as coming from an unknown number, which he

9

would not usually answer.  JOSEPH GRAY asked BELL, "Did you handle that ball [the sale of the eight-ball, or 3.5 grams of drugs, to the CS earlier that day]?"  BELL responded, "No, nope, I mean yeah, yeah we good, yeah on that, that's good.  Yeah, hell yeah.  Hell yeah."  JOSEPH GRAY replied, "Alright."

18.      On or about September 20, 2018, at a gas station in Cleveland, Ohio, OFIELD sold the CS 0.84 grams of a mixture of fentanyl, acetylfentanyl (a fentanyl analogue), and heroin for $150.

19.      On or about October 22, 2018, at approximately 6:45 p.m., JOSEPH GRAY called OFIELD on the telephone.  During the conversation, JOSEPH GRAY asked, "Can I get a uh, can I get a gram off of you [can I buy a gram of drugs]?"  OFIELD agreed, and JOSEPH GRAY inquired why OFIELD had not told JOSEPH GRAY he had drugs available.  OFIELD answered, "CUZ [BELL's nickname] called and he said, 'Grab a couple grams.'  I grabbed like a extra 5.  He had his extra 5 on him [BELL and OFIELD each picked up an extra 5 grams of drugs]."  OFIELD added that JOSEPH GRAY should "come grab the s--t [pick up the drugs]."

20.      On or about October 22, 2018, at approximately 10:20 p.m., BELL called JOSEPH GRAY on the telephone.  During the conversation, JOSEPH GRAY asked, "You want me to get the phone [the Customer Phone] from 248 [East 248th Street Euclid, Ohio] or meet you at Ray [OFIELD's] house and get it?  What's up?"  BELL responded, "248, come on."  JOSEPH GRAY asked, "Do you got my, the boy [heroin], or you don't?"  BELL responded, "Yeah, I got, a boy. . . . gotta play [a customer waiting] it for you, 10 and 10 [$10 worth of heroin and $10 worth of cocaine]."

21.      On or about October 22, 2018, at approximately 11:22 p.m., an unidentified female customer ("UF") called JOSEPH GRAY, who was using the Customer Phone.  During

the conversation, JOSEPH GRAY began by asking where the UF was.  The UF clarified that she did not need to see him then and was "just asking, are you going to be up tomorrow morning, because I'm gonna need to see you at like ten o'clock [I will need to buy drugs at about 10:00 a.m. tomorrow]."  JOSEPH GRAY said that would be fine and explained that he was "up every morning at seven o'clock" and, further, "my phone 24 hours [you can call this phone at any time for service]."

22.    On or about October 23, 2018, at approximately 9:28 a.m., EVANS called JOSEPH GRAY on the telephone.  During the conversation, JOSEPH GRAY asked, "Where you at, where you at?  I'm abouta' come get it [heroin]."  EVANS responded, "Yeah it's some, it's brown [the heroin is brown] too man.  It's some brown s--t."  JOSEPH GRAY stated, "Damn.  I'm about'a come get it, let me see."  EVANS replied, "I'm headed over that way.  I'll call you when I get to the spot."

23.    On or about October 23, 2018, at approximately 9:34 a.m., Person 13 called JOSEPH GRAY on the telephone.  During the conversation, JOSEPH GRAY directed Person 13 to the area of Glencoe Avenue and East 156th Street in Cleveland, Ohio.  Person 13 agreed to meet and told JOSEPH GRAY, "I got 35 [$35] if you could make me a 40 [$40 worth of heroin]."

24.    On or about October 23, 2018, at approximately 1:25 p.m., SIGGERS called OFIELD on the telephone.  During the conversation, OFIELD asked SIGGERS, "Hey, hey, did Low ever give you that gray s--t [fentanyl]?"  SIGGERS responded, "Yeah, it's gone."  OFIELD asked, "But it's gone?  But you got it from him?  Yeah, remember I told you about s--t.  That s--t was alright, though [the quality of the fentanyl was good].  It was cool wasn't it?"  SIGGERS responded, "I don't know . . . bangin' it [the customer was using the fentanyl intravenously]."

OFIELD affirmed, and stated that he wanted to know what SIGGERS's customers thought of the product, adding that other "people said it was cool [strong or high-quality]."

25.     On or about October 23, 2018, at approximately 5:45 p.m., BELL called JOSEPH GRAY on the telephone.  During the conversation, BELL advised JOSEPH GRAY of their inventory, saying they "need boy [heroin] and girl [cocaine]."  BELL said he obtained 5 gams of heroin or cocaine from OFIELD.  BELL continued, "I told him you gonna give him the money I gave you for that.  You gave him five Gs [5 grams]."  JOSEPH GRAY responded, "Yeah," and later stated, "That's my stuff anyway."  BELL asked, "Oh the boy [heroin]?" JOSEPH GRAY answered, "Yeah that was mine, I think."  JOSEPH GRAY then asked why, if BELL did not have cocaine, he had not called "CITY [LARRY JACKSON's nickname]."  JOSEPH GRAY explained that he had obtained cocaine "from A.C. [CROSBY's nickname]" that morning, and asked why BELL had not "tried to get grams for yourself, though.  That was my girl [cocaine]." BELL stated, "I'mma leave CITY six hundred [$600] every day, so we can just respond to get it [cocaine]."  BELL explained, "tonight I'm just leave him six hundred [$600] to give me a half [1/2 ounce].  Also, matter a fact I'mma leave him twelve hundred [dollars] to get me a zip [an ounce].  I'm give him twelve hundred tonight."

26.     On or about October 23, 2018, at approximately 6:00 p.m., JOSEPH GRAY called Person 6 on the telephone.  During the conversation, Person 6 asked if JOSEPH GRAY had "any of that [cocaine]."  JOSEPH GRAY responded that he had some, "but I ain't got, I ain't got it like A.C. [CROSBY's nickname], though."  Person 6 replied, "No, I, I need something small, you have something small?"  JOSEPH GRAY responded that he did, and they agreed to meet on Arcade Avenue in Cleveland, Ohio.

27.     On or about October 23, 2018, at approximately 10:03 p.m., JOSEPH GRAY and KIDD had a conversation in which they discussed counter-surveillance methods. KIDD said, "Two, two vice cars [vehicles operated by the Cleveland Police Department Vice Unit] are runnin' back to back on five, six Lakeshore [East 156 Street, near Lakeshore Boulevard]."

28.     On or about October 23, 2018, at approximately 10:30 p.m., CRAIG called JOSEPH GRAY on the telephone. During the conversation, CRAIG asked, "You got some girl [cocaine]?" JOSEPH GRAY responded, "Yeah." CRAIG said, "Where you at? I'm at John's house I got a play [customer] for you over here."

29.     On or about October 23, 2018, at approximately 5:59 p.m., SAMUEL GIBSON called JOSEPH GRAY on the telephone. During the conversation, SAMUEL GIBSON and JOSEPH GRAY made plans to meet, and SAMUEL GIBSON stated, "CUZ [BELL's nickname] say, 'I need three grams,'" mimicking BELL. JOSEPH GRAY responded that he was with BELL, and SAMUEL GIBSON then agreed to meet them both.

30.     On or about October 23, 2018, at approximately 6:54 p.m., Person 3 called BELL, who was using the Customer Phone. During the conversation, Person 3 said, "I need 30 of boy [$30 of heroin]." BELL agreed, and directed Person 3 to meet him on East 172nd Street, in Cleveland, Ohio.

31.     On or about October 23, 2018, at approximately 8:07 p.m., JOSEPH GRAY called RICKY JACKSON on the telephone. During the conversation, RICKY JACKSON demanded that JOSEPH GRAY pay the $500 dollars he owed before 10:00 p.m. JOSEPH GRAY initially attempted to laugh if off and then stated, "Ah man, we just servin' [selling drugs], that's all we doin'." RICKY JACKSON responded, "Ya'll just servin'. Man ya'll gone

keep servin'.  Y'all goin' serve.  I, I'm glad y'all just servin' like that.  [I'm glad you are selling drugs because that is how I will get paid.]"

32.     On or about October 24, 2018, at approximately 3:13 p.m., an unknown male customer called MACK, who was using the Customer Phone.  During the conversation, the customer asked for "ten a boy, ten a girl [$10 worth of heroin and $10 worth of cocaine]," and the two then made plans to meet near East 163rd Street and Arcade Avenue in Cleveland, Ohio.

33.     On or about October 24, 2018, at approximately 3:15 p.m., two unknown male customers and an unknown female customer called MACK, who was using the Customer Phone.  During the conversation, the customers discussed among themselves what they wanted, and the female customer ordered "30 a boy [$30 worth of heroin]" for the group.

34.     On or about October 24, 2018, at approximately 3:39 p.m., Person 13 called MACK, who was using the Customer Phone.  During the conversation, Person 13 said, "I got a 100 [$100] if you can make me a nice half [one-half gram of heroin]."  MACK then directed Person 13 to the area of Arcade Avenue in Cleveland, Ohio.

35.     On or about October 24, 2018, at approximately 4:17 p.m., Person 4 called MACK, who was using the Customer Phone.  During the conversation, Person 4 ordered "a 30 of boy and a seven of girl [$30 worth of heroin and $7 worth of cocaine]."  MACK then directed Person 4 to the Family Dollar.

36.     On or about October 24, 2018, at approximately 4:58 p.m., an unknown male customer called MACK, who was using the Customer Phone.  During the conversation, MACK directed the customer to the Family Dollar.

37.     On or about October 25, 2018, at approximately 6:27 p.m., JOSEPH GRAY called LARRY JACKSON on the telephone.  During the conversation, they discussed JOSEPH

GRAY's need make money to pay his debt to LARRY JACKSON. JOSEPH GRAY stated, "I gotta a blood, I gotta bleed [sell all of his drugs to make money] for the night before I go outta town." LARRY JACKSON said, "I let you owe, what you owe?" JOSEPH GRAY stated, "A little point seven, one seven [an amount of money or drugs]."

38.     On or about October 25, 2018, at approximately 7:40 p.m., Person 3 called JOSEPH GRAY on the telephone. During the conversation, Person 3 ordered "a dime of boy [$10 worth of heroin]." JOSEPH GRAY agreed to meet Person 3 on East 218th Street in Euclid, Ohio 15 to 20 minutes later.

39.     On or about October 25, 2018, at approximately 7:45 p.m., CROSBY called JOSEPH GRAY on the telephone. During the conversation, JOSEPH GRAY stated, "You got some boy [heroin]?" CROSBY responded, "Yeah I got like, I got like ten [10 grams]." JOSEPH GRAY and CROSBY then made plans to meet.

40.     On or about October 25, 2018, at approximately 7:48 p.m., Person 3 called JOSEPH GRAY on the telephone. During the conversation, Person 3 began, "Hello, what's up? I need a 20 of boy [$20 worth of heroin]." JOSEPH GRAY agreed to meet Person 3 on East 214th Street in Euclid, Ohio 15 to 20 minutes later.

41.     On or about October 26, 2018, CROSBY, while using the Customer Phone to arrange drug sales, conducted a hand-to-hand transaction with Person 13, selling Person 13 0.85 grams of a mixture of fentanyl and fentanyl analogues (acetylfentanyl and 4-ANPP).

42.     On or about October 26, 2018, CROSBY, while using the Customer Phone to arrange drug sales, conducted a hand-to-hand transaction with Person 3, selling Person 3 0.16 grams of a mixture of fentanyl and fentanyl analogues (acetylfentanyl and 4-ANPP) and 0.20 grams of cocaine base.

43.     On or about October, 27, 2018, at approximately 12:58 p.m., OFIELD called CROSBY, who was using the Customer Phone.  During the conversation, CROSBY said, "I knew I shoulda' got that s--t [cocaine] last night."  OFIELD responded, "Nah he [an unidentified supplier] tried, he tried to come with a different bag [different drug supply] last night."  OFIELD explained the supplier tried to give him a different drug supply from the one "we been rockin' [selling]."  CROSBY said, "Yeah he [the supplier] got me, he got me last night too.  He got me.  The hard s--t [crack cocaine], down with that, come on with that fluffy s--t [powder cocaine].  That s--t you gave me, what, what was that?  You get that?"  OFIELD responded, "That white white [powder cocaine]?"  CROSBY confirmed they were discussing "the s--t you gave me at the car lot."  OFIELD confirmed, and added, "That's good s--t.  He [the supplier] come with some lil' creamy lookin' s--t [off-color cocaine of lesser quality]."

44.     On or about October 28, 2018, at approximately 3:59 p.m., JOSEPH GRAY called LARRY JACKSON on the telephone.  During the conversation, JOSEPH GRAY stated, "I am on my way to you, n---a.  I gotta get some girl [cocaine].  You got some girl?"  LARRY JACKSON responded, "Ain't no girl around right now, brah.  Damn, there ain't no girl around right now.  N---a [unidentified supplier of drugs] out of town somewhere.  He said he'll call when he get back."  LARRY JACKSON then added, "Yeah, today, today.  What's up with you though man?  Who got the phones [the Customer Phone]?"  JOSEPH GRAY stated, "Lil SHANDELL [MACK]."

45.     On or about October 28, 2018, at approximately 10:58 p.m., JOSEPH GRAY called BELL on the telephone.  During the conversation, JOSEPH GRAY directed BELL to a customer who was looking for drugs, waiting at a Popeye's Restaurant off of Euclid Avenue.  JOSEPH GRAY stated that the customer wanted "two ten."  BELL asked, "They want what?"

JOSEPH GRAY explained, "Two ten for three grams [the customer will pay $210 for 3 grams of cocaine]." BELL, responded "Alright."

46.     On or about October 29, 2018, at approximately 11:07 a.m., SAMUEL GIBSON called JOSEPH GRAY on the telephone. During the conversation, SAMUEL GIBSON asked, "Did you get some girl [cocaine]?" JOSEPH GRAY stated, "Yeah," and then asked, "Got a play [heroin resupply] for me?" SAMUEL GIBSON answered, "Nah, have some girl [cocaine] for you."

47.     On or about October 29, 2018, at approximately 3:48 p.m., BELL called JOSEPH GRAY on the telephone. During the conversation, they discussed money issues, and JOSEPH GRAY stated, "Man, we ain't worried about that s--t, bruh'." BELL responded, "Alright, well get my s--t [drugs] then. Get my s--t, and I'll give you the money then. Go ahead and get my s--t. Get my s--t." JOSEPH GRAY asked if BELL wanted heroin, cocaine, or both, and how much he wanted. BELL stated, "Get the half [half ounce of cocaine] and I need the boy [heroin] too. I need like, I need like seven of boy [7 grams of heroin] and I need the half girl [half ounce of cocaine]."

48.     On or about October 29, 2018, at approximately 4:43 p.m., CRAIG called JOSEPH GRAY on the telephone. During the conversation, CRAIG said, "I need some girl [cocaine]. Can I get some girl?" JOSEPH GRAY replied he would call CRAIG back. CRAIG asked, "Did you go to the store yet?" JOSEPH GRAY said he had, and CRAIG responded "Ok, ok, ok, I just need a little ballie [eight-ball or one eighth of an ounce]."

49.     On or about October 29, 2018, at approximately 6:42 p.m., JOSEPH GRAY called OFIELD on the telephone. During the conversation, JOSEPH GRAY stated, "I need like two, two grams, like three grams. Pull up on me [bring me 2 to 3 grams of an unspecified

drug]." OFIELD responded, "D--n, where are you?" They then agreed to meet on Huntmere Avenue in Cleveland, Ohio for OFIELD to supply JOSEPH GRAY with drugs.

50.     On or about October 30, 2018, at approximately 12:34 p.m., BELL called JOSEPH GRAY on the telephone. During the conversation, BELL complained about not having the Customer Phone to make money. JOSEPH GRAY said that "A.C. [CROSBY's nickname]" made $4,000 over the weekend. BELL responded, "Right now I ain't makin' s--t [not making money] cuz I didn't have no girl [cocaine] last night, no boy [heroin] at all."

51.     On or about October 30, 2018, at approximately 6:38 p.m., JOSEPH GRAY called EVANS on the telephone. During the conversation, JOSEPH GRAY told EVANS, "Bring me extra two [2 grams of heroin]. Bring seven [7 grams]." EVANS affirmed, "A'ight."

52.     On or about October 30, 2018, at approximately 10:11 p.m., SALEM called JOSEPH GRAY on the telephone. During the conversation, SALEM discussed with JOSEPH GRAY the quality and appearance of heroin that SALEM had purchased from JOSEPH GRAY. SALEM explained that he wanted higher quality heroin than what he got. JOSEPH GRAY stated, "So, okay, okay, okay, all the brown stuff I gave you was s--t [the brown colored heroin was not good]." SALEM asked if JOSEPH GRAY would "swap me out tomorrow morning [exchange the bad heroin already purchased for higher quality heroin]?" JOSEPH GRAY agreed, stating, "Yeah, for sure, for sure, I swap out with you."

53.     On or about October 30, 2018, at approximately 10:20 a.m., CRAIG called BELL, who was using the Customer Phone. During the conversation, BELL asked if CRAIG had "some boy [heroin]." CRAIG stated that he did not, and BELL remarked that he had been looking for some since 7:00 a.m., and "missed like seven, eight hundred dollars [$700-$800 in heroin sales]." CRAIG replied that he would "try to find some s--t [heroin]." BELL responded,

18

"Alright, let me know man.  I'mma need like five, four, five, anything [4 or 5 grams or whatever he could get]."

54.     On or about October 31, 2018, at approximately 11:35 a.m., OFIELD called JOSEPH GRAY on the telephone.  During the conversation, they discussed customer reviews of the quality of the heroin they were selling, and its effect on customer demand.  JOSEPH GRAY said that he was unsure of the quality of the drugs and asked if OFIELD's customers liked them. OFIELD responded that some customers said it was "a seven, eight [7 or 8 on a scale of 1 to 10]."  OFIELD said, "S--t, everybody else said it was cool [good quality].  I gave it to, you know, Wes and them [SIGGERS and other DTO members], and they said it was too [relayed similar reviews]."  OFIELD indicated that heroin demand had been very high, and JOSEPH GRAY responded, "Yeah, hell yeah, s--t goes so fast you gotta buy hundreds [purchase at least 100 grams at a time to keep up with the demand]."  OFIELD affirmed and said someone else was selling the same product for the same price, and he explained, "I'm gonna go put something together or just keep stalling him out, keep buying twenty every day [cut the drugs to increase the amount of product for more sale opportunities or purchase 20 grams of heroin per day to keep the connection with the supplier]."  JOSEPH GRAY agreed with that plan.  OFIELD responded, "We'll just keep buying twenty every morning from both of them . . . so they don't put the moves down [we should purchase 20 grams every day from each supplier so neither cuts them off in favor or other dealers], you know what I'm saying?"  OFIELD also said he was about to replenish his supply, and JOSEPH GRAY asked him to bring five more grams of the heroin supply they were discussing.

55.     On or about October 31, 2018, at approximately 7:17 p.m., SALEM called JOSEPH GRAY on the telephone.  During the conversation, they agreed to exchange the heroin

19

that SALEM had purchased from JOSEPH GRAY earlier for better quality heroin. JOSEPH GRAY indicated this would be the last time he would exchange the heroin, stating, "You got to make this the last time, cause I don't do this, this like switching, this ain't right. We keep switching dope." SALEM asked, "So you got one three for me alright and it's for sure you know it's gonna be the right one [you have 1.3 grams of the better quality heroin]?" JOSEPH GRAY replied, "Yes."

56.     On or about November 2, 2018, at approximately 2:48 p.m., JOSEPH GRAY called COLVIN on the telephone. During the conversation, they discussed a vehicle JOSEPH GRAY was going to purchase. COLVIN advised JOSEPH GRAY on how to prove employment to secure a loan even though JOSEPH GRAY did not have a legitimate job. JOSEPH GRAY asked, "What do I tell them I do? Transportation?" COLVIN answered, "Direct care." JOSEPH GRAY said, "Direct care, and that's like, what? Like transportation?" COLVIN explained that it was not transportation, saying, "It's basically like caregiving, with like, taking care of basic needs." They then discussed whether JOSEPH GRAY had to provide a landline phone number for COLVIN's company to be listed as his purported employer. JOSEPH GRAY clarified the story they would provide, saying, "So basically, you my boss and I supposed to get in contact with you." COLVIN confirmed, "Yeah." JOSEPH GRAY also confirmed that they would say he had "been working there for two years."

57.     On or about November 3, 2018, at approximately 9:12 a.m., JOSEPH GRAY called EVANS on the telephone. During the conversation, JOSEPH GRAY asked, "Where you at, BIG HOMIE [EVANS's nickname]?" EVANS responded, "Over there." They then confirmed that EVANS was "over there." JOSEPH GRAY stated, "Aaaww, okay, okay. Listen, my dude, I need like. I know, you wanna give me like, uh. You said, you got a hundred-twenty

five [125 grams]." EVANS affirmed, "Yup. I had gave your boy CHINO [MASSEY] a couple

of 'em next day, so it'll take you down to about ninety [I have 90 grams left to sell to you]."

58.     On or about November 3, 2018, at approximately 11:32 a.m., AUVIL called

BELL, who was using the Customer Phone. During the conversation, AUVIL asked to purchase

"hard [crack cocaine]," and BELL confirmed, "Hard." AUVIL responded, "Yeah, hey, if you

can hook it up though, cause this, I'm buyin' for this dude cause he wants to try it out so [provide

a generous amount because this is for a new customer], yah know what I mean?" BELL

confirmed and then told AUVIL where to meet to make the purchase.

59.     On or about November 3, 2018, at approximately 11:40 p.m., Person 14 called an

unidentified male co-conspirator and member of the DTO, who was using the Customer Phone.

During the conversation, Person 14 stated, "I got ten [$10] on the girl [cocaine] you got me?"

The male agreed to sell Person 14 $10 worth of cocaine and directed Person 14 to the area of

East 156th Street.

60.     On or about November 4, 2018, at approximately 11:39 a.m., KIDD called

JOSEPH GRAY on the telephone. During the conversation, JOSEPH GRAY stated, "I need

some gas. D--n, my s--t on E [empty] too." KIDD, responded, "Double E [both need gasoline]."

JOSEPH GRAY later stated, "I need some bag [marijuana] too, where you at?" KIDD

responded, "Oh, the n-g [supplier], we gonna bump it to him, today. I, I, I, got some little s--t, so

I can get that [I have marijuana in exchange for the other drug]." JOSEPH GRAY responded,

"Oh, the weed?" KIDD affirmed.

61.     On or about November 4, 2018, at approximately 4:47 p.m., Person 14 called

JOSEPH GRAY on the telephone. During the conversation, Person 14 asked if JOSEPH GRAY

was the one speaking, to which JOSEPH GRAY said, "Yeah this is JAY [JOSEPH GRAY's

nickname]." They agreed to meet on East 250th Street, Euclid, Ohio and Person 14 ordered "30, 30 on the girl [$30 worth of cocaine]."

62.     On or about November 4, 2018, at approximately 4:50 p.m., KIDD called JOSEPH GRAY on the telephone. During the conversation, KIDD asked if JOSEPH GRAY had returned, and JOSEPH GRAY responded that he was "back," indicating he could help with the DTO's trafficking again, but that at that moment he was "at Wal-Mart." JOSEPH GRAY stated, "I'm out with you for real. I only got like 50 grams" of an unspecified drug.

63.     On or about November 4, 2018, at approximately 5:23 p.m., Person 13 called JOSEPH GRAY on the telephone. During the conversation, JOSEPH GRAY directed Person 13 to the area of East 200th Street in Euclid Ohio. Person 13 stated, "Alright cool, I got, I got 60 [$60] on me and whatever you owe me [ordering drugs worth $60 plus the amount owed to Person 13], so." JOSEPH GRAY agreed.

64.     On or about November 5, 2018, at approximately 3:00 p.m., SALEM called JOSEPH GRAY on the telephone. During the conversation, SALEM asked, "Alright and uh, just 80, what do you think you could for, do for that?" JOSEPH GRAY responded, "Just point six [for $80, SALEM could buy 0.6 grams of heroin]." SALEM responded. "Alright, appreciate ya'll and uh, and then yeah tomorrow you say you gonna have two, because I'm gonna try to bump into you before I even get into work, if you have two of the same s--t [if it works, I will try to buy 2 more grams of heroin tomorrow]." JOSEPH GRAY responded, "Yeah."

65.     On or about November 5, 2018, at approximately 5:50 p.m., Person 14 called BELL, who was using the Customer Phone. During the conversation, Person 14 asked, "What's up? I got 10 on the girl [I want $10 worth of cocaine]." BELL agreed to sell it to him, and they agreed to meet in the parking lot of the Family Dollar.

66.     On or about November 5, 2018, at approximately 8:32 p.m., JENNINGS called JOSEPH GRAY on the telephone.  During the conversation, JENNINGS stated, "Somebody wanted to get some [drugs].  Ah, but I don't want to ask you . . . .  Wait till you get here but they want something right now."  JOSEPH GRAY responded, "Alright.  Alright I got you.  That's cool.  Ah, ah, what size [how much]?"  JENNINGS responded, "What you have gave them last time."  JOSEPH GRAY responded, "Okay, okay, I got you, I got you."  JENNINGS stated, "alright, well how much, ah well, let me see how much she want."

67.     On or about November 5, 2018, at approximately 8:37 p.m., JENNINGS called JOSEPH GRAY on the telephone.  During the conversation, JENNINGS stated, "I was just trying to chill for her, I ain't think she [female customer] was bout to call me."  JENNINGS asked JOSEPH GRAY if he got the message she sent to him, and then JOSEPH GRAY checked his text message and said, "Ok, hell no actually, actually I came up from that [increased the price]."  JENNINGS responded, "Ok, so the price is?"  JOSEPH GRAY responded, "The price is going back up."  JENNINGS then agreed to buy the unspecified substance, and JOSEPH GRAY agreed to bring it to her.

68.     On or about November 6, 2018, near the intersection of Lee Road and Tarkington Avenue, in Cleveland, Ohio, JOSEPH GRAY sold SALEM 0.19 grams of a mixture of heroin and fentanyl.

69.     On or about November 6, 2018, at approximately 1:27 p.m., COLVIN called JOSEPH GRAY on the telephone.  During the conversation, JOSEPH GRAY affirmed he wanted COLVIN to help him falsely prove his employment to the Richland County Court.  JOSEPH GRAY stated, "Cause I'm gonna tell 'em I just got a job.  And they gonna verify it.  What do you want me to say?"  COLVIN replied, "You could tell them that you clean, that you

23

clean the houses, the residence for me." JOSEPH GRAY then stated, "I just gotta make a pay stub," to which COLVIN replied, "Give them my LLC."

70.     On or about November 6, 2018, at approximately 6:08 p.m., AUVIL called JOSEPH GRAY on the telephone. During the conversation, AUVIL explained that he had a male customer that "wanted to come through and grab, you know a decent amount [of heroin] and s--t." AUVIL explained that he wanted JOSEPH GRAY to give the customer "a little sample" because the customer had had some bad experiences, and AUVIL had told the customer, "it's good s--t [good quality heroin]." JOSEPH GRAY said he could provide "a little ten [$10 worth of heroin]." AUVIL accepted that proposal, and explained that it was worthwhile because the customer "gets both and s--t [buys both heroin and crack], you know what I mean?" AUVIL continued that the sample would pay off because "I told him it's some good s--t, and I just want him to . . . come through so I can make a few bucks too, you know?" JOSEPH GRAY agreed, and instructed AUVIL on where to meet.

71.     On or about November 7, 2018, at approximately 11:52 a.m., COLVIN called JOSEPH GRAY on the telephone. During the conversation, COLVIN could hear JOSEPH GRAY in the background set up a deal to sell heroin and cocaine to a customer, identified by a first name. JOSEPH GRAY stated, "Yeah, I'm around, how much you got, [customer first name]?" The customer responded, "Boy and girl [heroin and cocaine] in about 45 minutes." JOSEPH GRAY and COLVIN then resumed their conversation.

72.     On or about November 7, 2018, at approximately 1:02 p.m., JOSEPH GRAY called LARRY JACKSON on the telephone. During the conversation, JOSEPH GRAY asked, "Can I get a couple yams [grams]?" LARRY JACKSON stated, "I'm 'bout to do what you doin'

[I'm about to sell drugs].  I'm gonna call you when I come outside."  JOSEPH GRAY

responded, "Okay, can they bring me out like, like seven [7 grams of an unspecified drug]."

73.　　On or about November 8, 2018, at approximately 11:36 a.m., LARRY JACKSON

called JOSEPH GRAY on the telephone.  During the conversation, LARRY JACKSON asked

JOSEPH GRAY to sell drugs to a customer in JOSEPH GRAY's area:  "Ah man, got lick

[customer] on the, on the Mere [Huntmere Avenue] in a minute.  It's, it's my n---a in uh, semi-

truck."  JOSEPH GRAY agreed to sell to the customer.  LARRY JACKSON explained that the

customer was going to drive to the area and "call me, and ride through.  He has forty [$40]."

JOSEPH GRAY agreed to make the sale.

74.　　On or about November 8, 2018, at approximately 9:59 p.m., KIDD called

JOSEPH GRAY on the telephone.  During the conversation, JOSEPH GRAY stated, "I'm on

156 [E. 156th Street], I got regular, girl [cocaine]."  KIDD responded that he was "right now

pullin' up."

75.　　On or about November 10, 2018, at approximately 11:54 a.m., LARRY

JACKSON called JOSEPH GRAY on the telephone.  During the conversation, LARRY

JACKSON asked, "What are we goin' do?  The girl said the girl's fake [female customer said the

cocaine is low quality]."  JOSEPH GRAY acknowledged this, and they discussed how customers

complain.  LARRY JACKSON then stated, "Nah, man they [source of drug supply] say, they got

it [cocaine].  They say, they the usual, man.  Everythin' ain't good, ain't good [the cocaine

available is low quality].  I'm gonna call that n---a [supplier], man.  We gotta get some s--t goin',

man [we have to get better quality cocaine to sell].  I can need some action [make money].  We

bleedin' [losing money]."

76.     On or about November 12, 2018, at approximately 10:01 a.m., JOSEPH GRAY and MASSEY had a conversation in which MASSEY tried to order "Girl [cocaine]" from JOSEPH GRAY, who advised "I ain't got no girl." MASSEY asked, "What happened on the boy [heroin] side? We done ran through that s--t [sold all the heroin]. He ain't got no more?" JOSEPH GRAY responded in the negative, and they then discussed the quality of the heroin provided by EVANS, called "Big Boy."

77.     On or about November 12, 2018, at approximately 11:10 a.m., JOSEPH GRAY called EVANS on the telephone. During the conversation, JOSEPH GRAY greeted EVANS, "What's up, BIG HOMIE?" EVANS responded, "Huh? What did you need on that, um that b---h [cocaine]?" JOSEPH GRAY then orders, "Gimme' like seven [7 grams]." EVANS agreed and explained, "my brother he's gonna bring it on over this way." They then arranged for a delivery to JOSEPH GRAY, with EVANS confirming, "Okay, so he'll be over there in a minute."

78.     On or about November 12, 2018, at approximately 8:32 p.m., LARRY JACKSON called JOSEPH GRAY on the telephone. During the conversation, LARRY JACKSON asked, "Are you getting' girl [cocaine]?" JOSEPH GRAY responded that CROSBY had "some hard [crack cocaine]." LARRY JACKSON then inquired, "Damn where CUZ [BELL's nickname] at?" JOSEPH GRAY responded, "He hmm, he at the house. He waitin' on you." LARRY JACKSON then asked if BELL was "trappin' [dealing drugs]?" JOSEPH GRAY answered, "No, I'm out here. He won't be trappin'. I got the phone [the Customer Phone]." LARRY JACKSON then stated, "I got a lick [customer] for one of y'all for a hundred dollars. I don't know what to do." JOSEPH GRAY responded, "Okay, 'cause you know CUZ [BELL] is at the house. You can just call him and send him towards there [to the waiting customer]."

26

79.    On or about November 13, 2018, at approximately 2:06 p.m., JOSEPH GRAY called KIDD on the telephone. During the conversation, JOSEPH GRAY said that he would send a female customer to KIDD, and they discussed how KIDD would recognize her vehicle. KIDD stated, "What she 'bout to pull up in [what type of vehicle is she driving]?" JOSEPH GRAY responded, "Hmm, she only got a little Malibu, no truck, no truck." KIDD misheard that she did have a "truck," and JOSEPH GRAY clarified that she did not. KIDD responded that he was ready for the customer, and JOSEPH GRAY affirmed.

80.    On or about November 13, 2018, at approximately 4:03 p.m., JOSEPH GRAY called LARRY JACKSON on the telephone. During the conversation, JOSEPH GRAY asked where LARRY JACKSON was, and, "What's up with the girl [cocaine]? I need some girl." LARRY JACKSON asked, "What you got? How much you got?" JOSEPH GRAY said he had $600. LARRY JACKSON stated, "We goin' want some more tomorrow. And I ain't, I ain't 'bout to keep goin' at him [cocaine supplier] like that, JAY [JOSEPH GRAY's nickname]. He bought back a fourth [1/4 ounce] but it's not like a twelve-hundred [$1,200, the approximate cost of a full ounce of cocaine]. I ain't 'bout to keep goin' back to that man like that [without full payment]." JOSEPH GRAY stated, "I don't have twelve hundred. You goin' give me twelve hundred?" LARRY JACKSON asked how they should handle their supplier without full payment. JOSEPH GRAY responded, "No, I was 'bout to give all y'all stuff. I gave. I gotta give y'all your boy [heroin], girl [cocaine] and s--t, man." LARRY JACKSON then stated, "You owe my girl [unidentified supplier]. I know you owe him three sevens [owe the supplier for three separate orders of 7 grams]." JOSEPH GRAY explained, "Yeah, and I owe CUZ [BELL's nickname] three [3 grams], but I mean, might as well." LARRY JACKSON then asked, "How, I said, what you gotta, what you goin' to do?" JOSEPH GRAY stated, "Well I

27

said, 'I only got six-hundred.'" LARRY JACKSON agreed and stated, "Ah, alright, I'm 'bout. I'm 'bout to be in the Mere [Huntmere Avenue] in a minute. I'm on the Mere."

81.     On November 17, 2018, at approximately 11:21 a.m., COLVIN called JOSEPH GRAY on the telephone. During the conversation, JOSEPH GRAY stated, "I sell f--king drugs and take people to Home Depot and get this and that," to which COLVIN replied, "You right, JAY [JOSEPH GRAY's nickname]." JOSEPH GRAY stated, "I interact with 100 people [drug customers] a day, different personalities, they cryin' they need this and that, they crying."

82.     On or about November 17, 2018, at approximately 7:37 p.m., SAMUEL GIBSON called JOSEPH GRAY on the telephone. During the conversation, SAMUEL GIBSON asked, "Haven't give it to nobody yet [have you given the heroin sample to a customer yet]?" JOSEPH GRAY replied that he had not, and then stated, "I gotta find that s--t [the heroin sample] in my f--king pocket. I might've lost this s--t. Damn." JOSEPH GRAY was upset that he did not have the sample because he had a customer waiting to try it, and explained, "I got my lick [customer] waiting," and that customer would be "the first lick to try this s--t out, too [sample the batch of heroin]."

83.     On or about November 18, 2018, at approximately 9:50 a.m., JOSEPH GRAY called SAMUEL GIBSON. During the conversation, JOSEPH GRAY said that he was about to drive to come see him. SAMUEL GIBSON asked, "What you want, TWO [JOSEPH GRAY's nickname]?" JOSEPH GRAY replied, "I ain't got no money, so give me like fifteen [front me 15 grams]." SAMUEL GIBSON asked why "you always come to me when you broke?" SAMUEL GIBSON also asked if JOSEPH GRAY had found "the s--t [the lost heroin sample], bro?" JOSEPH GRAY answered he had not. SAMUEL GIBSON replied, "Oh my God, man.

You owe, you owe me, you owe me, man.  I ain't bout to do that [front drugs, providing drugs to a dealer on credit, with payment expected after the dealer sells the drugs]."

84.     On or about November 19, 2018, at approximately 12:43 p.m., CRAIG called JOSEPH GRAY on the telephone.  During the conversation, CRAIG asked who was driving JOSEPH GRAY's truck.  CRAIG then stated, "Man, tell Lil' Man [the driver] to take that Ganley s--t [dealership markings] off the truck, man."  JOSEPH GRAY agreed.  CRAIG said, "They [law enforcement] out here, bro."  Shortly after this call, JOSEPH GRAY's 2012 Ford Explorer was parked at a residence on Torbenson Drive in Cleveland, Ohio, owned by Person 6, in an attempt to avoid detection by law enforcement.

85.     On or about November 19, 2018, at approximately 5:13 p.m., NABULSI called JOSEPH GRAY on the telephone.  During the conversation, NABULSI asked, "Hey is this JAY [JOSEPH GRAY's nickname] or is this one of the other four dudes who was in the car?" JOSEPH GRAY replied, "It's JAY."  NABULSI then asked, "This is JAY?  How much is a G [gram]?"  JOSEPH GRAY replied, "120 [$120]."  NABULSI stated, "120, are you out of your f--king mind?  I don't pay more than 80 for it."  JOSEPH GRAY then asked, "Girl [cocaine] or boy [heroin]?"  NABULSI stated, "Girl [cocaine]."  JOSEPH GRAY replied, "Oh, 70 [$70]." NABULSI then ordered, "Okay so 70 of f--king hard [crack cocaine].  Can you come to like 260th [East 260 Street, Euclid, Ohio] area?"  JOSEPH GRAY then stated, "Yes for 70, 70 yes."

86.     On or about November 19, 2018, in Euclid, Ohio, SIGGERS possessed a digital scale and the following controlled substances: 1.70 grams of a mixture of fentanyl, 4-ANPP, and N-ethylpentylone (a synthetic cathinone and Schedule I controlled substance); and 3.60 grams of crack cocaine.

87.     On or about November 21, 2018, at approximately 11:14 a.m., MASSEY called BELL, who was using the Customer Phone.  During the conversation, MASSEY stated, "I'll tell you what, CUZ [BELL's nickname], I'll tell you what.  If you brought the half [half ounce of cocaine] for me, on the dead n---as [swearing on the deceased], I'll throw you six-twenty [$620].  On the dead n---as, I'll throw you six-twenty."

88.     On or about November 22, 2018, at approximately 11:18 a.m., MASSEY called BELL, who was using the Customer Phone.  During the conversation, MASSEY complained about not getting the amounts of drugs he wanted, saying, "I'm still waiting on my dope!"  BELL responded, "S--t dry man [it is hard to find drug supply]."  BELL repeated that the supply was "dry," and further explained, "N----s had went to the store [drug supplier] and I ain't even really get what I was supposed to get, some little boy [heroin].  S--t happened with CITY [LARRY JACKSON's nickname] and JAY [JOSEPH GRAY's nickname].  I don't know.  I didn't even get what I was suppose to get.  So, I ended up getting like ten Gs [grams].  I was supposed to get a halfy [one-half ounce, or 14 grams] myself."

89.     On or about November 23, 2018, at approximately 6:47 p.m., JOSEPH GRAY called SAMUEL GIBSON on the telephone.  During the conversation, JOSEPH GRAY stated he needed "10 [grams of drugs]" and that he had "752 [dollars]."  SAMUEL GIBSON stated, "I'm at my aunty house on 111 [East 111th Street] . . . .  Where you want me to meet you at?  In the hood or what?"  JOSEPH GRAY replied, "Yeah, in the hood, the 'Mere [Huntmere Avenue]."  JOSEPH GRAY reaffirmed he needed 10 grams, and said, "Well I'm at least 'bout to give you eleven fifty [$1150]."  SAMUEL GIBSON replied, "Okay, okay, talk to me, okay, okay here we go."

90.     On or about November 23, 2018, at approximately 11:41 p.m., OFIELD called JOSEPH GRAY on the telephone. During the conversation, JOSEPH GRAY stated, "it happened." OFIELD asked, "What happened?" JOSEPH GRAY answered, "Casket," and then explained, "On the, on the, on the s--t, the casket [heroin product so strong it can kill], they dig it [customers like the heroin]. He [a customer] texting me right now." JOSEPH GRAY then added, "Cause um. Man, I wouldn't be talkin' to you, man, if I'm tellin' you this s--t's fire on deck [the heroin I am selling is very strong]."

91.     On or about November 25, 2018, at approximately 11:37 p.m., JOSEPH GRAY called CRAIG on the telephone. During the conversation, JOSEPH GRAY said he had arrived to pick CRAIG up. JOSEPH GRAY also asked, "You got boy or girl [heroin or cocaine]?" CRAIG replied, "I just got boy."

92.     On or about November 27, 2018, at approximately 10:38 a.m., CROSBY called JOSEPH GRAY on the telephone. During the conversation, JOSEPH GRAY asked, "oh, you got some girl [cocaine] on you?" CROSBY responded, "A lil' s--t." JOSEPH GRAY responded, "Lemme get it, lemme get it, I need it. How much? What's lil' [how much do you mean by a 'lil']?" CROSBY responded, "five girl [5 grams of cocaine]." JOSEPH GRAY responded, "Lemme get it. What do I owe you? I gotta owe you on this one, two hundred, three hundred [$200, $300]. I'm just talking s--t. What do I owe you?" Crosby responded, "It's really five, five. It's really like five, three, five, four [5.3 or 5.4 grams of cocaine]."

93.     On or about November 27, 2018, at approximately 1:25 p.m., RICKY JACKSON called JOSEPH GRAY on the telephone. During the conversation, RICKY JACKSON stated, "Hey, listen what I was abouta' say, man, my n-g, I need you to, I need you to try this for me, bruh' [I need you to see what your customers think about this heroin]." JOSEPH GRAY

31

responded, "Hope it's what I'm lookin' for 'cuz I got some fire [strong heroin]." RICKY

JACKSON asked if he was looking for "white color" heroin product, and JOSEPH GRAY said,

"I mean, no. I got some tan s--t [heroin]. This kid OD [overdose] and s--t [it is very strong]."

RICKY JACKSON repeated, "Just try this for me, though, man [sell this heroin too and see what

your customers think about it]." JOSEPH GRAY then agreed to meet RICKY JACKSON to get

the heroin.

94.     On or about November 27, 2018, at approximately 4:21 p.m., RICKY JACKSON

called JOSEPH GRAY on the telephone. During the conversation, RICKY JACKSON said,

"Hey, tell that n---a [unknown party] we um, I left that s--t on the Mere for you, man, a sample

for you, man [left drugs at the Huntmere Avenue house]. I need to, I wanna see what this is [see

how customers rate this heroin sample]." JOSEPH GRAY agreed to get the sample.

95.     On or about November 27, 2018, at approximately 6:21 p.m., RICKY JACKSON

called BELL, who was using Customer Phone. Because RICKY JACKSON had called the same

number JOSEPH GRAY had been picking up, RICKY JACKSON assumed that JOSEPH GRAY

had answered the phone and said, "JAY [JOSEPH GRAY's nickname], you ever do that, JAY

[did you have a customer test the sample]?" RICKY JACKSON soon realized he was talking to

BELL. RICKY JACKSON then stated, "Yeah I gave him [JOSEPH GRAY] a little sample of

something. When he call you, just ask him for me real quick."

96.     On or about November 29, 2018, at approximately 8:44 a.m., JOSEPH GRAY

called BELL on the telephone. During the conversation, JOSEPH GRAY asked, "What's up?

We got boy [heroin]?" BELL replied, "No, that's what I was trying to get. I'm about to grab

some. I need to make a couple dollars. Pay this rent tomorrow. I'm about to grab me two Gs [2

grams of heroin]. Why don't you grab some [heroin] from JOHNNY [SAMUEL GIBSON's

nickname] until you, you know." JOSEPH GRAY stated, "Grab, grab a lot of that s--t [heroin], bro . . . . I'm about to go grab all of it because I tried to buy like fifty [50 grams] yesterday. He ain't even. I'm gonna call JOHNNY . . . . What he got? He said he had sixteen [16 grams] left, though." BELL said he did not know, but was getting five grams, to which JOSEPH GRAY reiterated BELL should "grab all sixteen [16 grams], bro, because I can pay for the rest of them." BELL stated, "Alright." JOSEPH GRAY explained, "That s--t about to be gone, though. I'm trying to tell you. I got like forty, forty, no, I got thirty. You can cut 35 [mix the heroin with a cutting agent to stretch 30 grams to 35 grams], but that ain't s--t [35 grams is not enough]." BELL responded, "I got to, I got to move that s--t too [sell it], work some of that s--t before you come down. I mean come down, or whatever." BELL added, "Alright, I'm about to grab it [the 16 grams from SAMUEL GIBSON]. I gotta go get money, man. I don't have all that."

97. On or about November 29, 2018, at approximately 11:01 a.m., JOSEPH GRAY called BELL on the telephone. During the conversation, JOSEPH GRAY asked, "What's going, is it going [how are sales]?" BELL stated, "A little slow, but it's still going, though, on and off." BELL added that he did not "want to go to the crib [his house] and grab mo' cash," as he needed to "make an extra five hundred and pay JOHNNY [SAMUEL GIBSON's nickname] all the way off for these fifteen [15 grams of heroin]. So, I paid him off, then, you know, still going a little bit." JOSEPH GRAY asked, "Oh, you paid the five hundred dollars?" BELL said, "Hell yeah, I paid him off."

98. On or about December 3, 2018, at approximately 12:43 p.m., RICKY JACKSON called JOSEPH GRAY on the telephone. During the conversation, RICKY JACKSON stated, "Ya'll sold me some fake s--t [low quality drugs] man. I'm ready to hit all ya'll n---as' pockets [ask for my money back.]" RICKY JACKSON explained, "That, that, that purple gray s--t

[heroin] man, that's fake.  You shouldn't even be selling that.  You know that, right?"  JOSEPH

GRAY responded, "No, no, no, no that's fake.  That's bulls--t."  RICKY JACKSON agreed,

"Yeah, yeah, yeah, yeah that's fake.  I should've, I should hit the n---a pocket [get my money

back]."  JOSEPH GRAY stated, "That's what I pay my workers with when they do some work

for me [I only use that low-quality purple/gray heroin to pay workers]."  RICKY JACKSON

stated, "That's fake, man.  I'm like, oh JAY [JOSEPH GRAY's nickname] selling fake s--t,

where the dime at?"  JOSEPH GRAY responded, "I got, I mean, I just bought fifty [50 grams of

heroin].  I'm ready."  RICKY JACKSON stated, "Damn I need a half [half ounce or 14 grams]

man, where you at?"

99.      On or about December 4, 2018, at approximately 12:18 p.m., JOSEPH GRAY

called KIDD on the telephone.  During the conversation, they agreed to meet, and KIDD stated,

"Hey, hey, hey, hey, uh, get us ten [10 grams of an unspecified drug]."  JOSEPH GRAY agreed.

KIDD also stated, "I was 'bout to say, can you uh, where, where the bag [unspecified drug] at, so

I can just go get it."  JOSEPH GRAY replied, "It's in the basement.  Ain't no bag, it's a

briefcase, it's like a small briefcase n---a."  KIDD affirmed.

100.     On or about December 5, 2018, at approximately 8:04 p.m., SALEM called

JOSEPH GRAY on the telephone.  During the conversation, SALEM stated, "I got that dub for

you, and I'm gonna come grab another half in a second.  I'm gonna call you once I'm in the car

[I have the $20 I owe you, and I want to buy another half gram of heroin]."  JOSEPH GRAY

agreed.

101.     On or about December 5, 2018, at approximately 8:31 p.m., SALEM called

JOSEPH GRAY on the telephone.  During the conversation, SALEM asked JOSEPH GRAY

"What do you uh, what do you do for 80 again [how much does $80 buy]?"  JOSEPH GRAY

said he would give 0.65 grams of heroin, and SALEM agreed to the deal.  JOSEPH GRAY then

said, "I'm right here in the corner!  On Naumann, where you at?"  The call concluded after

SALEM said, "Ok, I'm parked on the street right now."

102.    On or about December 5, 2018, in Euclid, Ohio, JOSEPH GRAY sold SALEM

0.55 grams of a mixture of heroin, fentanyl, and acetylfentanyl in a hand-to-hand drug

transaction.

103.    On or about December 5, 2018, at approximately 9:22 p.m., CROSBY called

JOSEPH GRAY on the telephone.  During the conversation, CROSBY stated, "Go back down

the Mere [Huntmere Avenue], though.  We gonna have to go back down the Mere.  They got me

bruh'!"  JOSEPH GRAY asked, "Who?"  CROSBY stated, "Vice [Cleveland Police Department

Vice Unit detectives]."  JOSEPH GRAY asked, "What happened?"  CROSBY answered, "I had

to take 'em but I got caught, man."  CROSBY continued, "I got, I'm in the Malibu, man.  On the

n---as, I got caught, bruh'.  I light weight pulled over though.  I, we had the guns and s--t in here,

man.  We got the guns and the s--t outta here, but I pulled over at the end like, f--k it.  We s--t

ain't, we two streets over.  F--k it.  They pulled up.  Vice and everythin'.  They talkin' 'bout

booty and everythin'.  They on s--t."

104.    On or about December 10, 2018, at approximately 10:44 a.m., SAMUEL

GIBSON called EVANS on the telephone.  During the conversation, EVANS stated "I don't

know if you want to uh, give the little dude and them to just try or test, or whatever [find

someone to try a new batch of heroin]."  SAMUEL GIBSON responded, "Yeah . . . .  You know

I'm always ready to work some."  SAMUEL GIBSON asked how customers were responding to

the new batch.  EVANS explained, "He [an unknown drug tester] said, 'The legs lasts him all the

way to this mornin' [the drugs kept him high for a long time].'  Man, so he says he giving the

motherf--ker ten, eleven, man [the customer would rate the drugs very highly, 10 or 11 on a scale of 1 to 10]." SAMUEL GIBSON said he would come and "grab some" of that heroin. EVANS replied, "OK, yeah, and I'mma, I'mma do mine [sell my supply]," and explained that other dealers were getting this heroin for $70 or $75 per gram.

105.    On or about December 12, 2018, at approximately 9:52 a.m., an unknown male ("UM") called MARK EVANS on the telephone. During the conversation, the UM stated, "And she got, she got the little thing [unspecified drugs] ready for you," and specified "three of them ballies [3 eight-balls or 3 quantities of 1/8 of an ounce], right, right?" EVANS confirmed. The UM then added, "Six bundles and uh, six of them little Gs [grams, reporting other drug inventory currently available].  You know?"

106.    On or about December 12, 2018, at approximately 9:54 a.m., EVANS called MASSEY on the telephone. During the conversation, they made arrangements to meet for EVANS to supply MASSEY with drugs.

107.    On or about December 12, 2018, following the call that began at approximately 9:54 a.m., EVANS travelled to a residence in the Cleveland, Ohio area, and picked up drug supply from an unknown male. EVANS then travelled to EVANS's home in Cleveland, Ohio, and conducted a hand-to-hand drug transaction with MASSEY. EVANS departed the area, followed by unmarked law enforcement vehicles.

108.    On or about December 12, 2018, at approximately 11:52 a.m., an unidentified male ("UM") called EVANS on the telephone. During the conversation, EVANS told the UM that he suspected he was being watched by law enforcement, explaining, "it's been this motherf--king car" and that the car had been "behind me, ever since I left this motherf--king spot [where

he met MASSEY], man." The UM asked, "What type of car?" EVANS responded, "An Altima."

109.    On or about December 12, 2018, after he suspected that law enforcement was following him in a Nissan Altima, EVANS deactivated two telephone lines, and activated a new telephone line.

110.    On or about December 12, 2018, at approximately 12:20 p.m., SAMUEL GIBSON and NABULSI had a conversation in which SAMUEL GIBSON asked, "Did you put your name on the reservation [did you reserve a rental car under your name]?" NABULSI replied that she did.

111.    On or about December 12, 2018, at approximately 7:03 p.m., SAMUEL GIBSON and NABULSI exchanged text messages. During the exchange, NABULSI asked SAMUEL GIBSON to "drop a 20/20 [$20 worth of cocaine and $20 worth of heroin] off" at her residence.

112.    On or about December 14, 2018, at approximately 5:00 p.m., SAMUEL GIBSON called EVANS on the telephone. During the conversation, EVANS and SAMUEL GIBSON spoke at length about their drug trafficking activities and those of other DTO members. SAMUEL GIBSON also noted that "there a new kid in town [a new batch of heroin]" that he had obtained, and indicated that his customers rated it a 6 out of 10. Later, EVANS said that he too "got a new kid [new batch of heroin]." SAMUEL GIBSON then asked, "You said, you said, the new kid nice [is the quality of the heroin good]?" EVANS replied, "Yeah. Hell, yeah."

113.    On or about December 20, 2018, at approximately 3:53 p.m., SAMUEL GIBSON called NABULSI on the telephone. During the conversation, NABULSI stated, "Um, I am coming to you for that half [half gram] right now." SAMUEL GIBSON then explained that he was out of "girl [cocaine]," and they then discussed when and how he would procure more.

NABULSI stated, "I need one [1 gram]." NABULSI then explained that her friend had overdosed on her couch shortly before SAMUEL GIBSON called, and NABULSI had only noticed in time to intervene and save her life because she happened to be leaving her house to purchase Xanax for a former co-worker of hers. As result, the friend had been able to walk away. Regarding the heroin on which her friend had overdosed, NABULSI told SAMUEL GIBSON, "it was your s--t." SAMUEL GIBSON denied that, and then asked, "What s--t?" NABULSI stated, "Your eight [eight-ball or 1/8th ounce], the boy [heroin]." SAMUEL GIBSON denied having given her heroin, and she clarified that it was the drugs "your f--king brother gave me." SAMUEL GIBSON responded, "Okay, like you said, I ain't gave it to you." NABULSI responded, "Okay, whatever. I saw you guys like do it together, or whatever."

114. On or about December 21, 2018, at approximately 3:19 p.m., SAMUEL GIBSON called NABULSI on the telephone. During the conversation, NABULSI ordered $100 worth of heroin, part of which was for Person 10, a friend of hers who lived in Sandusky, Ohio. SAMUEL GIBSON then asked whether NABULSI could bring additional heroin to Sandusky so that Person 10 and NABULSI could sell it, asking, "Can y'all be able to sell it?" NABULSI replied, "Alright, I can ask her [Person 10] when I get there."

115. On or about December 21, 2018, at approximately 3:50 p.m., SAMUEL GIBSON called Christina Gordenier on the telephone. During the conversation, Gordenier stated, "I do the glass [crystal methamphetamine]," and said that she could not find crystal methamphetamine in Michigan. SAMUEL GIBSON later told her, "Just make sure you call me to put your, put your own order in [to order crystal methamphetamine]."

116. On or about December 22, 2018, at approximately 9:36 p.m., SAMUEL GIBSON and William Bloomfield had a conversation in which Bloomfield ordered "a hundred twenty

hard [$120 worth of crack cocaine]," and added that "she [Gordenier] want fifty or sixty of the other stuff [$50 or $60 worth of an unspecified drug], but only give her a thirty [$30 worth]." SAMUEL GIBSON confirmed, "Give her a thirty," and Bloomfield agreed, "Yeah, and then I want a hundred twenty [$120 worth of crack cocaine]."

117.    On or about December 23, 2018, at approximately 9:27 a.m., SAMUEL GIBSON called Bloomfield on the telephone.  During the conversation, they negotiated the price of a cocaine purchase.  Bloomfield stated, "It's very f--king.  Oh I need a.  Oh f--k, that s--t last night . . . , I'm serious.  Is, is it hard [crack cocaine]?  I don't want that s--t like last night.  [What you sold me last night was not good.  I want crack cocaine.]"  Later, SAMUEL GIBSON agreed to make up for the bad cocaine and compensate with a better quality on this order, saying, "I'mma look out for, I'mma look out for, if you got one twenty [$120 to purchase more drugs]."

118.    On or about December 23, 2018, at approximately 9:47 a.m., SAMUEL GIBSON called Gordenier on the telephone.  During the conversation, SAMUEL GIBSON asked "Can y'all get your hands on any guns out there [Michigan]?"  Gordenier responded "Um, not me and my husband.  My husband's a convicted felon, so he can't.  But um, Billy [Bloomfield] might be able to.  Or I can ask, um, my husband to ask his, um, step-brother back in Michigan.  I think he's got a couple that he is looking to get rid of."  SAMUEL GIBSON then stated that, if Gordenier brought some guns the next time she came to Ohio, SAMUEL GIBSON would buy them.  SAMUEL GIBSON and Gordenier then agreed to meet later for Gordenier to purchase a gram of crystal methamphetamine from SAMUEL GIBSON.

119.    On or about December 23, 2018, at approximately 11:15 a.m., SAMUEL GIBSON called Gordenier on the telephone.  During the conversation, SAMUEL GIBSON asked, "Hey, do you know anybody that mess with the Percs [Percocet, the brand name for an

oxycodone-based prescription pill]?"  Gordenier said she did not, but offered Suboxone, a brand name for a buprenorphine- and naloxone-based prescription pill.  SAMUEL GIBSON asked how many she had because he "know people that be needing them."  Gordenier answered that she received 120 each month and explained that "we sell half of our scripts . . . up in Michigan after we go to the doctor."  Gordenier agreed to bring SAMUEL GIBSON her and her husband's Suboxone after seeing a doctor, and SAMUEL GIBSON stated, "I'll take them, I'll take them all if you want to get rid of them all."

120.     On or about December 23, 2018, at approximately 12:22 p.m., SAMUEL GIBSON called Bloomfield on the telephone.  During the conversation, SAMUEL GIBSON asked how many guns Bloomfield could get from an unidentified third party.  Bloomfield said he could get about 25 or 30 guns.  SAMUEL GIBSON asked, "Okay, what kind you, do you got Glocks?"  Bloomfield answered, "We got nines, got Glock nine, Glock ten, got a couple forty-fives [9mm caliber guns, 9mm and 10mm caliber guns manufactured by Glock, .45 caliber guns], got uh, he [the third party] got all kinds of s--t, he says."  Bloomfield added, "Three fifty-seven, couple three fifty-sevens [.357 caliber guns]."  SAMUEL GIBSON then asked, "He [the third party], he got some assault riffles?"  BLOOFIELD listed, "He said he got, got a couple AKs [AK-47 assault rifles], he said an older Tech nine [TEC-9 assault pistol], with the arm thing that swings out, he said, then he's got, uh, I think he said, uh, A, uh, AR-15s, a couple AR-15s [AR-15-style assault rifles]."  They then discussed a plan for the third party to stage a burglary at his own home in order to claim that the guns were stolen, so that they can be brought to sell to SAMUEL GIBSON.

121.     On or about January 2, 2019, at approximately 8:19 p.m., MALCOLM GIBSON called an unknown male ("UM") on the telephone.  During the conversation, MALCOLM

GIBSON asked, "You still up there?" The UM responded, "I was at the door, what's going on?" MALCOLM GIBSON responded, "I need another little half of meth [half-gram or half ounce of methamphetamine], then I just gonna get, you by the gram. [continue buying from the UM by the gram]"

122. On or about January 3, 2019, at approximately 1:17 p.m., MALCOLM GIBSON called an unknown male ("UM") on the telephone. During the conversation, MALCOLM GIBSON stated, "Two and a half, bro [ordering 2.5 grams]." The UM responded, "Alright."

123. On or about January 3, 2019, at approximately 3:12 p.m., BELL called MALCOLM GIBSON on the telephone. During the conversation, BELL stated, "S--t, just getting back. About to holler at your ass in a minute. You still . . . everything still sweet [is the quality of the heroin still good]?" MALCOLM GIBSON responded, "Hell yeah, I'm missing y'all n---as [you guys haven't ordered in a while], that n---a A.C. be playing [CROSBY has been unreliable]." BELL stated, "A.C. playing, I'm trying to call that n---a right now. He ain't answering the phone and s--t." MALCOLM GIBSON responded, "Yeah, that n---a, I don't know, he playing." BELL said CROSBY was "f--king up," and explained that other drug dealers were receiving "cheap ass s--t, that forty dollar s--t [bad quality heroin]. That bulls--t." MALCOLM GIBSON agreed and stated he was "going to shop somewhere else, bro [get a different supplier]." BELL stated he would "need an eight or ten [8 or 10 grams of heroin]. I'm about to call you in an hour or two, bro." MALCOLM GIBSON replied, "Yeah, I can do that."

124. On or about January 3, 2019, at approximately 4:26 p.m., SAMUEL GIBSON called MALCOLM GIBSON on the telephone. During the conversation, they made arrangements to return a rental car they were using to a woman, identified only by first name as Person 5, who had rented the car for them. SAMUEL GIBSON expressed concerned that

41

MALCOLM GIBSON left drugs in the car, which MALCOLM GIBSON said was not a concern. SAMUEL GIBSON explained, "They about to come and grab the car." MALCOLM GIBSON responded, "No they're not coming down here. Don't send them down here [do not let them come the get the car now]." MALCOLM GIBSON explained, "I'm about to park that b---h. As soon as [Person 5] call me. [Person 5] about to call me. I'm about to go get her car. Then I will park this b---h somewhere and they can go grab it. Don't bring her down to the trap [the location where the drug supply is stored]. I'm here now." SAMUEL GIBSON responded that "she [Person 5] know where the trap at already."

125. On or about January 4, 2019, at approximately 9:41 a.m., JOSEPH GRAY called MALCOLM GIBSON on the telephone. During the conversation, JOSEPH GRAY stated, "Yes, I need ten [10 grams of heroin]. Where you at?" MALCOLM GIBSON responded, "I'm at the house, come on."

126. On or about January 5, 2019, at approximately 12:04 p.m., SAMUEL GIBSON called MALCOLM GIBSON on the telephone. During the conversation, SAMUEL GIBSON explained how he had just seen JOSEPH GRAY the night before in possession of what he estimated was 300 grams of "white s--t [fentanyl-based heroin product]." SAMUEL GIBSON and MALCOLM GIBSON then talked about a supplier named "CHOP" who my have supplied JOSEPH GRAY with the heroin. MALCOLM GIBSON asked, "Why the f--k he [JOSEPH GRAY] just don't grab that s--t from me [why didn't JOSEPH GRAY buy that heroin product from me]?" MALCOLM GIBSON added that he "got the white s--t, though." SAMUEL GIBSON responded, "Oh you got the white s--t? 'Cuz I still got like three and a half [3.5 ounces] left I think. Ay, how many did you give me, Malc [MALCOLM]?" MALCOLM GIBSON responded, "Five [5 ounces]."

127.     On or about January 8, 2019, in Cleveland, Ohio, JOSEPH GRAY attempted to flee from law enforcement when officers attempted to stop him.

128.     On or about January 8, 2019, in Cleveland, Ohio, JOSEPH GRAY possessed two digital scales, a Sig Sauer, Model P224, .40 caliber semiautomatic pistol, loaded with 10 rounds of ammunition, and the following controlled substances: 5.283 grams of acetylfentanyl, 2.524 grams of diacetylmorphine heroin, 0.081 grams of diacetylmorphine heroin, and 2.045 grams of cocaine base.

129.     On or about January 8, 2019, at approximately 6:33 a.m., JOSEPH GRAY, using a recorded line in the Cuyahoga County Jail, called COLVIN on the telephone.  During the conversation, JOSEPH GRAY told COLVIN he had "serious charges" coming, and began to explain how he had been arrested, saying that he had been arrested at approximately 1:00 a.m., when he was trying to make some money, and had gotten a late start the previous night and knew he should not be out so late.  COLVIN then interrupted him, telling him to stop talking about it. JOSEPH GRAY told COLVIN the charges included fleeing from police, and COLVIN asked why he had not stopped for the police.  JOSEPH GRAY responded, "Why would I stop?  I got a f--king gun in the car."  JOSEPH GRAY complained that the car he had been driving was slow, and that, before police tried to stop him, he was "trying to get a little play [drug deal] on the freeway."  Approximately 6 minutes into the call, at JOSEPH GRAY's request, COLVIN called BELL and merged that call with JOSEPH GRAY for a three-way call.  During that part of the conversation, JOSEPH GRAY explained that he had been arrested for "everything," including the "hammer [firearm]."  JOSEPH GRAY instructed BELL to go to the "cell phone spot" and get the phones, and take the passcodes for the phones.  After BELL was ready to write down the information, JOSEPH GRAY described, among other things, the false subscriber name on his

43

phones, including the Customer Phone; his password for Metro PCS, the service provider on the phones; and his Apple iCloud username and password, in order to download all the contacts. In the middle of providing the iCloud information, JOSEPH GRAY asked COLVIN if she was listening, and COLVIN replied, "Yes." COLVIN asked what else needed to be done, and JOSEPH GRAY provided further instructions on taking the "chip" from his other phone, identified by three digits in the phone number. JOSEPH GRAY continued to provide BELL with instructions on reconstituting the Customer Phone, including where to procure a replacement iPhone. COLVIN then informed BELL that she had sent him the information he needed. JOSEPH GRAY told BELL to get the phone immediately because "you know they about to be ringing [customers will be calling to order drugs]." BELL responded that he would get it "right now." JOSEPH GRAY then confirmed that BELL knew it was the Customer Phone, identified by three digits in the phone number, and BELL replied that he was "about to go grab it right now."

130.     On or about January 9, 2019, at approximately 3:26 p.m., SAMUEL GIBSON called MALCOLM GIBSON on the telephone. During the conversation, SAMUEL GIBSON asked, "A.C. [CROSBY's nickname] have more of that ice s--t [methamphetamine]?" MALCOLM GIBSON responded, "Yup."

131.     On or about January 10, 2019, at approximately 1:18 a.m., SAMUEL GIBSON called MALCOLM GIBSON on the telephone. During the conversation, SAMUEL GIBSON asked, "What you want for a three-five [3.5 grams], MOUND?" MALCOLM GIBSON asked, "Of what?" SAMUEL GIBSON responded, "Of the ice s--t [methamphetamine]." MALCOLM GIBSON responded, "Uh, are you, one-twenty [$120]."

132.     On or about January 10, 2019, at approximately 9:35 a.m., an unknown male ("UM") called MALCOLM GIBSON on the telephone.  During the conversation, the UM asked MALCOLM GIBSON to confirm he had "some puppy [heroin]."  MALCOLM GIBSON stated, "Yup.  I got some girl [cocaine] too."  The UM responded, "Alright, alright, alright," and then ordered "a half a G [half a gram]."  MALCOLM GIBSON asked, "Of what, the dog [heroin]?"  The UM replied, "Yeah."  The UM then asked, "What you want for it?"  MALCOLM GIBSON stated, "Right.  Eighty a gram, forty a half [$80 for a gram, $40 for a half gram]."

133.     On or about January 10, 2019, at the Shop in Cleveland, Ohio, JOSEPH GRAY, OFIELD, CROSBY, and DA'EON GRAY, as well as Person 7, Person 8, and Person 9, possessed a money counter, thousands of dollars of U.S. currency, drug packaging materials, a scale, and the following controlled substances:  36.89 grams of cocaine base (crack cocaine); 4.15 grams of a mixture of heroin, fentanyl, and fentanyl analogues (acetylfentanyl, carfentanil, 4-ANPP); 1.29 grams of a mixture of heroin, fentanyl, and carfentanil; 2.38 grams of a mixture of heroin and fentanyl; 1.51 grams of a mixture of fentanyl and cocaine; and 0.075 grams of a mixture of heroin, fentanyl, fentanyl analogues (acetylfentanyl, carfentanil, 4-ANPP), and cocaine.  JOSEPH GRAY concealed some of the drugs in his buttocks.

134.     On or about January 31, 2019, in Euclid, Ohio, LARRY JACKSON attempted to flee from police when officers attempted to stop him.

135.     On or about January 31, 2019, in Euclid, Ohio, LARRY JACKSON possessed a digital scale, $1,357 in U.S. currency, and the following controlled substances:  4.22 grams of cocaine base; 9.14 grams of a mixture of heroin, fentanyl, and fentanyl analogues (carfentanil and 4-ANPP); and 6.32 grams of a mixture of heroin, fentanyl, and fentanyl analogues (carfentanil, 4-ANPP, and acetylfentanyl).

136.    On or about February 21, 2019, COLVIN drove JOSEPH GRAY in a Ford Edge from a residence in Cleveland, Ohio, to a residence in Euclid, Ohio, to sell controlled substances to a customer.

All in violation of Title 21, United States Code, Section 846.

COUNT 2
(Possession with Intent to Distribute Controlled Substances,
21 U.S.C. §§ 841(a)(1) and (b)(1)(C))

The Grand Jury further charges:

137.    On or about January 8, 2018, in the Northern District of Ohio, Eastern Division, Defendant WESTLEY SIGGERS did knowingly and intentionally possess with intent to distribute approximately 4.37 grams of a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance; carfentanil, a Schedule I controlled substance; and cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C).

COUNT 3
(Possession with Intent to Distribute a Controlled Substance,
21 U.S.C. §§ 841(a)(1) and (b)(1)(C))

The Grand Jury further charges:

138.    On or about January 8, 2018, in the Northern District of Ohio, Eastern Division, Defendant WESTLEY SIGGERS did knowingly and intentionally possess with intent to distribute approximately 6.06 grams of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C).

COUNT 4
(Possession with Intent to Distribute Controlled Substances,
21 U.S.C. §§ 841(a)(1) and (b)(1)(B))

The Grand Jury further charges:

139.    On or about June 6, 2018, in the Northern District of Ohio, Eastern Division,

Defendant WESTLEY SIGGERS did knowingly and intentionally possess with intent to

distribute approximately 12.33 grams of a mixture and substance containing a detectable amount

of cyclopropyl fentanyl, a Schedule I controlled substance; phenyl fentanyl, a Schedule I

controlled substance; and 4-ANPP, a Schedule II controlled substance, in violation of Title 21,

United States Code, Sections 841(a)(1) and (b)(1)(B).

COUNT 5
(Possession with Intent to Distribute Controlled Substances,
21 U.S.C. §§ 841(a)(1) and (b)(1)(B))

The Grand Jury further charges:

140.    On or about June 6, 2018, in the Northern District of Ohio, Eastern Division,

Defendant WESTLEY SIGGERS did knowingly and intentionally possess with intent to

distribute approximately 17.27 grams of a mixture and substance containing a detectable amount

of cyclopropyl fentanyl, a Schedule I controlled substance; phenyl fentanyl, a Schedule I

controlled substance; 4-ANPP, a Schedule II controlled substance; heroin, a Schedule I

controlled substance; and cocaine, a Schedule II controlled substance, in violation of Title 21,

United States Code, Sections 841(a)(1) and (b)(1)(B).

COUNT 6
(Possession with Intent to Distribute a Controlled Substance,
21 U.S.C. §§ 841(a)(1) and (b)(1)(C))

The Grand Jury further charges:

141.    On or about June 6, 2018, in the Northern District of Ohio, Eastern Division,

Defendant WESTLEY SIGGERS did knowingly and intentionally possess with intent to

distribute approximately 4.75 grams of a mixture and substance containing a detectable amount

of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code,

Sections 841(a)(1) and (b)(1)(C).

COUNT 7
(Distribution of Controlled Substances, 21 U.S.C. §§ 841(a)(1) and (b)(1)(C))

The Grand Jury further charges:

142.    On or about October 26, 2018, in the Northern District of Ohio, Eastern Division,

Defendant AARON CROSBY did knowingly and intentionally distribute approximately 0.85

grams of a mixture and substance containing a detectable amount of fentanyl, a Schedule II

controlled substance; acetylfentanyl, a Schedule I controlled substance; and 4-ANPP, a Schedule

II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and

(b)(1)(C).

COUNT 8
(Distribution of Controlled Substances, 21 U.S.C. §§ 841(a)(1) and (b)(1)(C))

The Grand Jury further charges:

143.    On or about October 26, 2018, in the Northern District of Ohio, Eastern Division,

Defendant AARON CROSBY did knowingly and intentionally distribute approximately 0.16

grams of a mixture and substance containing a detectable amount of fentanyl, a Schedule II

controlled substance; acetylfentanyl, a Schedule I controlled substance; and 4-ANPP, a Schedule

II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C).

COUNT 9

(Distribution of a Controlled Substance, 21 U.S.C. §§ 841(a)(1) and (b)(1)(C))

The Grand Jury further charges:

144. On or about October 26, 2018, in the Northern District of Ohio, Eastern Division, Defendant AARON CROSBY did knowingly and intentionally distribute approximately 0.20 grams of a mixture and substance containing a detectable amount of cocaine base, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C).

COUNT 10

(Distribution of Controlled Substances, 21 U.S.C. §§ 841(a)(1) and (b)(1)(C))

The Grand Jury further charges:

145. On or about November 6, 2018, in the Northern District of Ohio, Eastern Division, Defendant JOSEPH P. GRAY, JR. did knowingly and intentionally distribute approximately 0.19 grams of a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance, and fentanyl, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C).

COUNT 11

(Possession with Intent to Distribute Controlled Substances, 21 U.S.C. §§ 841(a)(1) and (b)(1)(C))

The Grand Jury further charges:

146. On or about November 19, 2018, in the Northern District of Ohio, Eastern Division, Defendant WESTLEY SIGGERS did knowingly and intentionally possess with intent to distribute approximately 1.70 grams of a mixture and substance containing a detectable

amount of fentanyl, a Schedule II controlled substance; 4-ANPP, a Schedule II controlled

substance; and N-ethylpentylone, a Schedule I controlled substance,  in violation of Title 21,

United States Code, Sections 841(a)(1) and (b)(1)(C).

COUNT 12

(Possession with Intent to Distribute a Controlled Substance,
21 U.S.C. §§ 841(a)(1) and (b)(1)(C))

The Grand Jury further charges:

147.    On or about November 19, 2018, in the Northern District of Ohio, Eastern

Division, Defendant WESTLEY SIGGERS did knowingly and intentionally possess with intent

to distribute approximately 3.60 grams of a mixture and substance containing a detectable

amount of cocaine base, a Schedule II controlled substance, in violation of Title 21, United

States Code, Sections 841(a)(1) and (b)(1)(C).

COUNT 13

(Distribution of Controlled Substances, 21 U.S.C. §§ 841(a)(1) and (b)(1)(C))

The Grand Jury further charges:

148.    On or about December 5, 2018, in the Northern District of Ohio, Eastern

Division, Defendant JOSEPH P. GRAY, JR. did knowingly and intentionally distribute

approximately 0.55 grams of a mixture and substance containing a detectable amount of heroin, a

Schedule I controlled substance; fentanyl, a Schedule II controlled substance; and acetylfentanyl,

a Schedule I controlled substance, in violation of Title 21, United States Code, Sections

841(a)(1) and (b)(1)(C).

<u>COUNT 14</u>
(Possession with Intent to Distribute a Controlled Substance,
21 U.S.C. §§ 841(a)(1) and (b)(1)(C))

The Grand Jury further charges:

149.    On or about January 8, 2019, in the Northern District of Ohio, Eastern Division,

Defendant JOSEPH P. GRAY, JR. did knowingly and intentionally possess with intent to

distribute approximately 5.283 grams of a mixture and substance containing a detectable amount

of acetylfentanyl, a Schedule I controlled substance, in violation of Title 21, United States Code,

Sections 841(a)(1) and (b)(1)(C).

<u>COUNT 15</u>
(Possession with Intent to Distribute a Controlled Substance,
21 U.S.C. §§ 841(a)(1) and (b)(1)(C))

The Grand Jury further charges:

150.    On or about January 8, 2019, in the Northern District of Ohio, Eastern Division,

Defendant JOSEPH P. GRAY, JR. did knowingly and intentionally possess with intent to

distribute approximately 2.605 grams of a mixture and substance containing a detectable amount

of diacetylmorphine heroin, a Schedule I controlled substance, in violation of Title 21, United

States Code, Sections 841(a)(1) and (b)(1)(C).

<u>COUNT 16</u>
(Possession with Intent to Distribute a Controlled Substance,
21 U.S.C. §§ 841(a)(1) and (b)(1)(C))

The Grand Jury further charges:

151.    On or about January 8, 2019, in the Northern District of Ohio, Eastern Division,

Defendant JOSEPH P. GRAY, JR. did knowingly and intentionally possess with intent to

distribute approximately 2.045 grams of a mixture and substance containing a detectable amount

of cocaine base, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C).

COUNT 17

(Felon in Possession of Firearm and Ammunition, 18 U.S.C. § 922(g)(1))

The Grand Jury further charges:

152.    On or about January 8, 2019, in the Northern District of Ohio, Eastern Division, Defendant JOSEPH P. GRAY, JR., having been previously convicted of crimes punishable by imprisonment for terms exceeding one year, those being: Drug Possession (F4) and Attempted Drug Possession (F4), on or about March 4, 2013, in Case Number CR-12-563849-A, in Cuyahoga County Common Pleas Court; and Drug Possession (F4), on or about March 4, 2013, in Case Number CR-12-565414-A, in Cuyahoga County Common Pleas Court, did knowingly possess in and affecting interstate commerce a firearm, to wit: a Sig Sauer, Model P224, .40 caliber semi-automatic pistol, bearing serial number 50A005584, and 10 rounds of .40 caliber ammunition, said firearm and ammunition having been shipped and transported in interstate commerce, in violation of Title 18, United States Code, Section 922(g)(1).

COUNT 18

(Possession of a Firearm in Furtherance of a Drug Trafficking Crime, 18 U.S.C. § 924(c)(1)(A))

The Grand Jury further charges:

153.    On or about January 8, 2019, in the Northern District of Ohio, Eastern Division, Defendant JOSEPH P. GRAY, JR. did knowingly possess a firearm, that is, a Sig Sauer, Model P224, .40 caliber semi-automatic pistol, bearing serial number 50A005584, in furtherance of a drug trafficking crime for which JOSEPH GRAY may be prosecuted in a court of the United States, that is, conspiracy to distribute and to possess with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 846, as charged in Count 1 of

52

this indictment; and possession with intent to distribute mixtures and substances containing controlled substances, in violation of Title 21, United States Code, Section 841(a)(1), as charged in Counts 14 through 16 of this indictment, in violation of Title 18, United States Code, Section 924(c)(1)(A).

## COUNT 19
(Possession with Intent to Distribute a Controlled Substance,
21 U.S.C. §§ 841(a)(1) and (b)(1)(B) and 18 U.S.C. § 2)

The Grand Jury further charges:

154.    On or about January 10, 2019, in the Northern District of Ohio, Eastern Division, Defendants JOSEPH P. GRAY, JR., RAQWAN OFIELD, AARON CROSBY, and DA'EON GRAY did knowingly and intentionally possess with intent to distribute approximately 36.89 grams of a mixture and substance containing a detectable amount of cocaine base, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(B), and Title 18, United States Code, Section 2.

## COUNT 20
(Possession with Intent to Distribute Controlled Substances,
21 U.S.C. §§ 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 2)

The Grand Jury further charges:

155.    On or about January 10, 2019, in the Northern District of Ohio, Eastern Division, Defendants JOSEPH P. GRAY, JR., RAQWAN OFIELD, AARON CROSBY, and DA'EON GRAY did knowingly and intentionally possess with intent to distribute approximately 4.15 grams of a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance; fentanyl, a Schedule II controlled substance; acetylfentanyl, a Schedule I controlled substance; carfentanil, a Schedule I controlled substance; and 4-ANPP, a Schedule II

controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C), and Title 18, United States Code, Section 2.

COUNT 21
(Possession with Intent to Distribute Controlled Substances,
21 U.S.C. §§ 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 2)

The Grand Jury further charges:

156.    On or about January 10, 2019, in the Northern District of Ohio, Eastern Division, Defendants JOSEPH P. GRAY, JR., RAQWAN OFIELD, AARON CROSBY, and DA'EON GRAY did knowingly and intentionally possess with intent to distribute approximately 2.38 grams of a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance, and fentanyl, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C), and Title 18, United States Code, Section 2.

COUNT 22
(Possession with Intent to Distribute Controlled Substances,
21 U.S.C. §§ 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 2)

The Grand Jury further charges:

157.    On or about January 10, 2019, in the Northern District of Ohio, Eastern Division, Defendants JOSEPH P. GRAY, JR., RAQWAN OFIELD, AARON CROSBY, and DA'EON GRAY did knowingly and intentionally possess with intent to distribute approximately 1.29 grams of a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance; fentanyl, a Schedule II controlled substance; and carfentanil, a Schedule I controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C), and Title 18, United States Code, Section 2.

COUNT 23
(Possession with Intent to Distribute Controlled Substances,
21 U.S.C. §§ 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 2)

The Grand Jury further charges:

158.    On or about January 10, 2019, in the Northern District of Ohio, Eastern Division,

Defendants JOSEPH P. GRAY, JR., RAQWAN OFIELD, AARON CROSBY, and DA'EON

GRAY did knowingly and intentionally possess with intent to distribute approximately 1.51

grams of a mixture and substance containing a detectable amount of fentanyl, a Schedule II

controlled substance, and cocaine, a Schedule II controlled substance, in violation of Title 21,

United States Code, Sections 841(a)(1) and (b)(1)(C), and Title 18, United States Code,

Section 2.

COUNT 24
(Possession with Intent to Distribute Controlled Substances,
21 U.S.C. §§ 841(a)(1) and (b)(1)(B))

The Grand Jury further charges:

159.    On or about January 31, 2019, in the Northern District of Ohio, Eastern Division,

Defendant LARRY JACKSON did knowingly and intentionally possess with intent to distribute

approximately 9.14 grams of a mixture and substance containing a detectable amount of heroin, a

Schedule I controlled substance; fentanyl, a Schedule II controlled substance, carfentanil, a

Schedule I controlled substance; and 4-ANPP, a Schedule II controlled substance; and 6.32

grams of a mixture and substance containing a detectable amount of heroin, a Schedule I

controlled substance; fentanyl, a Schedule II controlled substance, carfentanil, a Schedule I

controlled substance; 4-ANPP, a Schedule II controlled substance; and acetylfentanyl, a

Schedule I controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1)

and (b)(1)(B).

## COUNT 25
(Possession with Intent to Distribute a Controlled Substance,
21 U.S.C. §§ 841(a)(1) and (b)(1)(C))

The Grand Jury further charges:

160.    On or about January 31, 2019, in the Northern District of Ohio, Eastern Division,

Defendant LARRY JACKSON did knowingly and intentionally possess with intent to distribute

approximately 4.22 grams of a mixture and substance containing a detectable amount of cocaine

base, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections

841(a)(1) and (b)(1)(C).

## COUNTS 26 – 42
(Use of a Communication Facility in Furtherance of a Drug Trafficking Crime,
21 U.S.C. § 843(b))

The Grand Jury further charges:

161.    On or about the dates and approximate times listed below, in the Northern District

of Ohio, Eastern Division, and elsewhere, those Defendants listed below did knowingly and

intentionally use a communication facility, to wit: a telephone, to facilitate acts constituting a

felony under Title 21, United Stated Code, Sections 841(a)(1) and 846:

| Count | Defendants | Date | Time |
|-------|-----------|------|------|
| 26 | WESTLEY SIGGERS RAQWAN OFIELD | October 23, 2018 | 1:25 p.m. |
| 27 | JOSEPH P. GRAY, JR. BRENDAN CRAIG | October 23, 2018 | 10:30 p.m. |
| 28 | SHONDELL MACK | October 24, 2018 | 3:39 p.m. |
| 29 | JOSEPH P. GRAY, JR. AARON CROSBY | October 25, 2018 | 7:45 p.m. |
| 30 | JOSEPH P. GRAY, JR. GEORGE SALEM | October 31, 2018 | 7:17 p.m. |
| 31 | JOSEPH P. GRAY, JR. AMINAH COLVIN | November 2, 2018 | 2:48 p.m. |
| 32 | JOSEPH P. GRAY, JR. SHANITA JENNINGS | November 5, 2018 | 8:37 p.m. |

| 33 | JOSEPH P. GRAY, JR.<br>JEFFREY AUVIL | November 6, 2018 | 6:08 p.m. |
|----|----|----|----|
| 34 | JOSEPH P. GRAY, JR.<br>LARRY JACKSON | November 13, 2018 | 4:03 p.m. |
| 35 | PAUL BELL<br>CHINO MASSEY | November 22, 2018 | 11:18 a.m. |
| 36 | JOSEPH P. GRAY, JR.<br>RICKY JACKSON | November 27, 2018 | 1:25 p.m. |
| 37 | JOSEPH P. GRAY, JR.<br>LEJON KIDD, JR. | December 4, 2018 | 12:18 p.m. |
| 38 | MARK EVANS<br>SAMUEL GIBSON | December 14, 2018 | 5:00 p.m. |
| 39 | SAMUEL GIBSON<br>LEANNA NABULSI | December 21, 2018 | 3:19 p.m. |
| 40 | SAMUEL GIBSON<br>CHRISTINA GORDENIER | December 23, 2018 | 11:15 a.m. |
| 41 | SAMUEL GIBSON<br>WILLIAM BLOOMFIELD | December 23, 2018 | 12:22 p.m. |
| 42 | MALCOLM GIBSON<br>PAUL BELL | January 3, 2019 | 3:12 p.m. |

All in violation of Title 21, United Stated Code, Section 843(b).

FORFEITURE

The Grand Jury further charges:

162.    For the purpose of alleging forfeiture pursuant to Title 21, United States Code, Section 853, Title 18, United States Code, Section 924(d)(1), and Title 28, United States Code, Section 2461(c), the allegations of Counts 1 through 42, inclusive, are incorporated herein by reference.  As a result of the foregoing offenses, Defendants JOSEPH P. GRAY, JR., MALCOLM GIBSON, SAMUEL GIBSON, MARK EVANS, WESTLEY SIGGERS, RAQWAN OFIELD, PAUL BELL, LARRY JACKSON, RICKY JACKSON, BRENDAN CRAIG, AARON CROSBY, CHINO MASSEY, SHONDELL MACK, LEJON KIDD, JR., DA'EON GRAY, AMINAH COLVIN, SHANITA JENNINGS, LEANNA NABULSI, GEORGE SALEM, JEFFREY AUVIL, WILLIAM BLOOMFIELD, and CHRISTINA GORDENIER shall forfeit to the United States any and all property constituting, or derived

57

from, any proceeds they obtained, directly or indirectly, as the result of such violations; any and all of their property used or intended to be used, in any manner or part, to commit or to facilitate the commission of such violations; and, any and all property (including firearms and ammunition) involved in or used in the commission of such violations.

A TRUE BILL.

Original document - Signatures on file with the Clerk of Courts, pursuant to the E-Government Act of 2002.