IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:19-CR-147 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | |
| | ) | |
| JOSEPH P. GRAY, JR., | ) | GOVERNMENT'S RESPONSE TO |
| | ) | DEFENDANT'S SENTENCING |
| Defendant. | ) | MEMORANDUM |
| | ) | |

The United States of America, by and through its counsel, Justin E. Herdman, United States Attorney, and Elliot Morrison and Brian S. Deckert, Assistant United States Attorneys, hereby responds to Defendant's sentencing memorandum.

In sum, the government submits that Probation has accurately calculated the offense level and criminal history category, subject to possible upward departures: a final offense level of 39, and criminal history category VI, resulting a guidelines range of 360 months – life, plus 60 months consecutive for the 18 U.S.C. § 924(c) violation in Count 18.  Further, Defendant should be subject to an upward departure under U.S.S.G. § 5K2.1 and § 5K2.2 for conduct resulting in death or physical injury to another—overdoses resulting from the use of heroin, fentanyl, fentanyl analogues, and other drugs he was selling.  For those reasons, and after considering the § 3553(a) factors, the government submits that a sentence of life imprisonment is appropriate.

I.      **FACTUAL BACKGROUND**

The PSR provides an accurate recitation of many of the facts of these offenses, but does not encompass the full range of relevant conduct.  Indeed, no document could encompass the full range of this long-running and wide-ranging conspiracy.  As a result, the government here briefly

supplements the PSR's factual recitations with additional details of Defendant's crimes, focusing on aspects to be addressed through witness testimony and exhibits at the sentencing hearing.

At bottom, Defendant was the leader and orchestrator of a massive drug conspiracy. Defendant's own words attest the breadth and scope of both his efforts to coordinate with his coconspirators and to sell directly. To begin, the Customer phone at the heart of the conspiracy was his phone, which he passed around and managed. As he told one customer early in the wire, "my phone twenty-four hours," meaning that customers can call the phone 24 hours per day, 7 days a week. (*See* Ex 1.)[1] The Customer Phone could at all hours because Defendant rotated it through coconspirators when he was not using it. This helped them make money selling drugs, and helped ensure that his number was a reliable source for his customers, who never needed call any other number to buy.

Defendant built up a huge clientele. He and his co-conspirators served hundreds of customers each day, every day that the phone was active. Indeed, he said served 100 customers per day by himself. He described how he spends his day as follows: "I sell f\*\*king drugs and take people to Home Depot and get this and that," and explained, "I interact with 100 people a day." (*See* Ex. 3.) The Customer Phone was never down for long. They had an established system for reconstituting the Phone even when, for example, law enforcement seized it from him. They simply obtained a new iPhone device, ported over the number, and downloaded the contacts and other content and settings from the cloud. (*See* R. 351: Final Presentence Report ¶ 26, PageID 2030-31 (hereinafter, the "PSR").)

---

[1] The government attaches transcripts of certain phone calls, and will offer audio recordings at the sentencing hearing.

Defendant was doing more than selling directly and coordinating the use of the Customer Phone. He also coordinated resupplying, and they frequently obtained large quantities to service their hundreds of customers. Early in the wire, he and Ofield discussed how often they needed to resupply because of how much they were selling. (*See* Ex. 2.) Defendant said, "S**t goes so fast. You gotta buy hundreds [of grams at a time]." (*Id.*) Ofield proposed a plan to keep a steady supply from two suppliers: "buying twenty [grams] every morning from both of them," and Defendant agreed. (*Id.*)

At the end of November 2018, he was buying in larger quantities when possible. On the 24th, he discussed having five different "testers"—experienced heroin users—meet at the Shop to evaluate a new batch from Malcolm Gibson, and stressed that he needed to be able to supply at least 50 grams. (*See* Ex. 5.) On the 29th, he and Bell discussed obtaining everything that Samuel Gibson ("Johnny") had left to sell, and Defendant explained that he had 30 grams left, which he could stretch to 35 grams by adding cut, but in his view, "that ain't s**t." (*See* Ex. 7.) By December 3rd, he reported to Rickey Jackson, "I just bought fifty." (*See* Ex. 8.)

By January 2019, though, he was buying even larger quantities. On January 5, 2019, Samuel and Malcolm Gibson were discussing Defendant and their concern that he was going to other sources of supply. (*See* Ex. 9.) Samuel explained he had seen Defendant out dealing, and say he "had like 300 grams on him," which he described as "[s]ome white shit," meaning fentanyl- or fentanyl-analogue-derived heroin product. (*Id.*)

Defendant also specifically pursued heroin product that was particularly deadly. On November 23, 2018, Defendant proudly reported to Ofield that he had obtained product strong enough to kill:

> OFIELD: What happened?
> GRAY: Casket.

3

> OFIELD: What?
>
> GRAY: True story, casket.
>
> OFIELD: You talkin' 'bout?
>
> GRAY: On the, on the, on the s**t, the casket, they dig it. He textin' me now.

(*See* Ex. 4.) This was too elliptical for Ofield, and so Defendant was more explicit:

> GRAY: Cause um. Man, I wouldn't be talkin' to you, man, if I'm tellin' you this s**t's fire on deck.
>
> OFIELD: You said, it is fire, or they?
>
> GRAY: Yeah. It is. Phil dead.

(*Id.*) They then proceeded to discuss who Phil was, and how to obtain more of the heroin product at issue from Samuel Gibson. A few days later, Defendant was bragging to Ricky Jackson about the strength of his product, saying "I got the fire." (Ex. 6.) He explained, "This kid OD and s**t." (*Id.*) That was his way of validating his claim of having "the fire."

Overdoses were all too common a part of his business—selling purported "heroin" that almost always contained fentanyl and . As noted in the PSR, the government will focus at sentencing on the overdose of a particular customer (the "Victim") on June 8, 2018. To Defendant, that sale was probably one of scores of similar sales that day. But to the Victim's family, it is the event that changed their lives forever.

Leading up to June 8, 2018, the Victim and his friend, JG, had been sober for about one year, but had returned to using for about a week. The Victim and JG had been buying from a dealer known to them as "Jay," who they reached by calling the Customer Phone—though sometimes Jay's associates, identifying themselves as his brother or cousin, would deliver the drugs. On June 7, the Victim and JG had been using heroin they bought from Defendant. That evening, after using with JG, the Victim returned home and continued texting with another

4

friend, "Zucco," about where they were obtaining purported heroin and other drugs, and also conversing with friends and family, some of whom understood he had relapsed and were trying to convince him to return to sobriety.

At 10:00pm, the Victim called the Customer Phone twice, with a 7-second connection and a 10-second connection.  A minute later, the Victim sent the text message, "Black Cadillac," to the Customer Phone, informing Defendant that he was in his mother's vehicle.  At 10:14pm, the Victim texted Zucco, "I'm down on 152 and just got some soft and boy [in the area of East 152nd Street where he bought powder cocaine and heroin product]."  They continued to discuss with Zucco what they were each using, and also conversed with family and the mother of his child, who pleaded with him not to use.  He stopped responding to incoming texts and calls just before 1:00am on June 8, 2019.  The mother of his child sent increasingly desperate text messages until approximately 2:00am, and then resumed the next morning, initially believing he was ignoring her to make her worry, and then suspecting it was more serious.

She went to the house to check on him, and she and members of his family forced entry into his locked room.  He was found face-down, in full rigor, in the pose associated with someone who has overdosed on heroin.  In his room was a bindle of cocaine and an empty bindle and dollar bill each with residue of a substance containing fentanyl, acetylfentanyl, and cocaine.  A toxicology screen of the blood from his body was also positive for the same substances.  Fentanyl was specifically found in a concentration of 6.7 nanograms/milliliter, while the therapeutic range for fentanyl is 1 – 3 ng/ml.

## II.   DEFENDANT'S GUIDELINES OBJECTIONS SHOULD BE OVERRULED.

Defendant's objections to Probation's guidelines calculations are without merit and should be overruled.  As Defendant's objections and sentencing memorandum do not include

substantive arguments supporting his objections, this response is necessarily brief, but the government will be prepared to address any specific arguments raised at the sentencing.

### A. DRUG QUANTITY

The evidence easily supports a base offense level of 34. The weights attributable to Defendant easily exceed the numbers in the PSR, but the government acknowledges that the Court is required to err on the side of caution.

Section 2D1.1 requires courts to include drug quantities that were not seized, even where no precise quantity can be known and where the drugs at issue may never have existed: "Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance." U.S.S.G. § 2D1.1, n.5. This includes amounts that a defendant agreed or attempted to distribute, whether or not the distribution ever took place, though seizures in some circumstances will be represent a more accurate measure of distributions planned or attempted. *See id.* "The inability to know the precise amount does not prevent the court from making a best estimate, so long as it can be shown by a preponderance." *Id.*

The principle that "[t]he district court need only estimate the quantity involved based on the 'preponderance of the evidence'" is well established in Sixth Circuit law. *See United States v. Fitzgerald*, 754 F. App'x 351, 368 (6th Cir. 2018) (quoting *United States v. Walton*, 908 F.2d 1289, 1302 (6th Cir. 1990)); *see also, e.g.*, *United States v. Hernandez,* 227 F.3d 686, 699 (6th Cir. 2000) ("Approximations are completely appropriate."); *United States v. Penaloza*, No. 18-5907, 2019 WL 3522426, at *4 (6th Cir. Aug. 2, 2019) (affirming estimate of 8 kg in each of 7 – 8 transactions, or 56 – 64 kg total, based on witness statement that defendant delivered 5 – 7 kg on 6 – 9 occasions); *United States v. Baker*, 750 F. App'x 434, 436 (6th Cir. 2018) ("Since the exact quantity of drugs was unknown in Baker's case, the district court had to estimate the

amount of drugs for which Baker was responsible."); *see generally United States v. Jeross*, 521 F.3d 562, 570 (6th Cir. 2008) (collecting cases).

The weight estimates here are extremely conservative.  They include only the brief period of interception in this case, and do not include the vast quantities of drugs sold before and, to a lesser extent, after the periods of interception—which probably exceed the amounts sold during the interception.  They are also further limited to transactions in which the callers expressly agree to a specific amount of drugs or dollar value, excluding a great many transactions conducted in vague or coded terms.

The government anticipates that Defendant may argue that the drug weight conversion for heroin, rather than fentanyl or fentanyl analogues, should be used.  But across the many times investigators seized drugs from this conspiracy, Defendant was effectively never selling simple heroin, as opposed to heroin product with fentanyl and/or fentanyl analogues.  Indeed, in the vast majority of cases, fentanyl analogues were found.  But the Court need not choose a single conversion factor to reach a base level of 34.  Even if only half the approximately 1.5kg of heroin/fentanyl at issue was assumed to have fentanyl analogues, a quarter have to fentanyl, and—contrary to the evidence—a quarter to have heroin without any fentanyl of any kind, Defendant would still be easily over 10,000kg in converted drug weight between those substances and the crack cocaine.[2]

---

[2]  For example, leaving aside the heroin, 750 grams of analogues (1 gram to 10 kg), 325 grams of fentanyl (1 gram to 2.5 kg), and 992.5 grams of cocaine base (1 gram to 3.571 kg) adds up to more than 11,850kg of converted drug weight.

B.     LEADERSHIP ENHANCEMENT

Defendant also objects to receiving more than a 2-level leadership enhancement. But these 4 levels under U.S.S.G. § 3B1.1(a) are appropriate, and well earned. In seeking the 2-level enhancement, Defendant appears to argue that this conspiracy did not involve 5 or more criminal participants. That is a difficult argument to make when 20 other people have pled guilty to this conspiracy. But there need not be anyone else even charged. The many testers and other accomplices that Defendant employed—sometimes directly, and sometimes through others like Da'eon Gray—would count towards the scheme's extensiveness.

Nor can he contest that he was a leader or organizer subject to a 4-level increase, as opposed to a lower-level manager subject to a 3-level increase. He was *the* central figure. Without his organizing and leading, the conspiracy simply would not exist. Indeed, he continued directing others' actions while he was locked up—directing, for example, both Bell and Colvin on how to reconstitute the Customer Phone. (*See* PSR ¶ 26, PageID 2030-31.)

C.     CRIMINAL LIVELIHOOD

Defendant concedes the first requirement of a 2-level enhancement under U.S.S.G. § 2D1.1(b)(16)(E): an aggravating role (no matter what size). So the question is whether drug dealing was part of a criminal livelihood. It cannot be seriously disputed that Defendant made more than $14,500 in a one-year period selling such a vast quantity of drugs. The government thus assumes that Defendant will claim that drug-dealing was not his primary occupation.

But again, Defendant's own words doom any attempt to avoid the conclusion that there was little time for anything else in his life. As he said, he dealt to 100 people a day. Equally telling is that he had no real job, despite his hollow claim to Probation. Defendant told Probation that he "worked in construction in 2018" and "was paid in cash and earned approximately $1,200 per month," while trying to start his own construction business. (*See* PSR ¶ 80, PageID 2040.)

8

But if this were so, he would not need Colvin to attest to two different fake jobs working for her.  As set forth in more detail in the Indictment, ¶ 56, Defendant was seeking a loan and needed to show he had a job when he did not.  He asked her, "What do I tell them I do? Transportation?"  She answered, "Direct care."  He had no real notion of what his own girlfriend did, so he asked for clarification:  "Direct care, and that's like, what?  Like transportation?"  She explained that it was not transportation, saying, "It's basically like caregiving, with like, taking care of basic needs."  They repeated this song and dance for the Richland County court, only with a different cover story.  Colvin explained, "You could tell them that you clean, that you clean the houses, the residence for me."  *See* Indictment ¶ 69.

### D.     RECKLESS ENDANGERMENT DURING FLIGHT

This enhancement under U.S.S.G. § 3C1.2 applies multiple times over, as it was Defendant's standard practice to take police on high-speed chases.  Two examples will suffice:

- On September 6, 2018, Defendant fled from police after officers in a marked car attempted to conduct a traffic stop with lights and sirens activated.  Defendant accelerated his vehicle to speeds in excess of 60 miles per hour on residential side streets and near an active school zone to avoid being stopped and apprehended.

- On January 8, 2019, in the incident at issue in the drug and firearm charges in Counts 14 – 18, Defendant was carrying drugs, a loaded gun, and distribution paraphernalia, and reacted to lights and sirens by taking the Ohio State Highway Patrol on a high-speed chase on Interstate 90 and downtown Cleveland.  The Trooper estimated Defendant to be traveling up to about 110 miles per hour on Interstate 90 westbound, and witnessed it drive off the roadway as it rounded a curve.  Defendant exited, ran a red light, crossed the center line, and then over-

9

corrected and drove off the road on the right.  He then exited, dropping his loaded pistol at the door to the car, and he began to attempt to flee on foot.

A high-speed car chase is the classic case in which this enhancement is applied, even without any of the added elements of danger involved here—school zones, running red lights, traveling more than 100 miles per hour, and dropping a firearm on the side of East 25th Street. *See United States v. Heard*, 749 F. App'x 367, 371 (6th Cir. 2018); *United States v. Walker*, 717 F. App'x 632, 634 (7th Cir. 2018); *United States v. Davidson*, 933 F.3d 912, 914 (8th Cir. 2019).

### III. SENTENCE TO BE IMPOSED

The nature and circumstances of the offense, Defendant's character, and the need for the sentence imposed under 18 U.S.C. § 3553(a) warrant a life sentence.

First, the details of Defendant's conduct has been discussed in greater detail above, but it should be placed in the context of the opioid crisis afflicting the country to understand just how aggravating the facts here are, and the degree to which the need for the sentence imposed warrants the maximum sentence.  This conduct—which began in January 2018—occurred at a time when an already-severe crisis was only deepening.  In 2017, the last year for which statistics have been fully computed by the Centers for Disease Control and Prevention ("CDC"), more than 70,000 people in this country died of drug overdoses (an increase of more than 10% over 2016), and more than two thirds of those overdoses involved opioids (12% rate increase).  Nor was this a national trend far removed from this District.  Ohio was arguably the state hit hardest by the deepening overdose crisis.  Ohio had the second-highest rate in *all* of the following categories:

- Total drug overdose deaths.  *See* CDC, *Drug Overdose Deaths*, https://www.cdc.gov/drugoverdose/data/statedeaths.html ("In 2017, the states with

the highest rates of death due to drug overdose were West Virginia (57.8 per 100,000), Ohio (46.3 per 100,000), . . . .").

- Increase in opioid-involved overdose deaths. See CDC, Scholl et al., *Drug and Opioid-Involved Overdose Deaths – United States, 2013–2017*, available at http://dx.doi.org/10.15585/mmwr.mm675152e1 ("From 2016 to 2017, opioid-involved overdose . . . [d]eath rates increased significantly in 15 states, with the largest relative changes in North Carolina (28.6%), Ohio (19.1%), and Maine (18.7%).").

- Overdose death rate from synthetic opioids. *See id.* ("The highest synthetic opioid-involved overdose death rates in 2017 were in West Virginia (37.4 per 100,000), Ohio (32.4), and New Hampshire (30.4).").

While Defendant may not have been aware of the specifics of these figures, it is hard to imagine someone in this District—let alone someone leading a massive opioid-distribution conspiracy—avoiding knowledge of how these drugs have devastated our community and the country as a whole.

More important, Defendant was, at best, recklessly indifferent to the risk of death from his conduct. As some of the intercepted calls show, Defendant was not only aware of the risk of his customers dying, but the danger of the product was something to be celebrated in his mind. It was, to him, *good* news when he could report, "this kid OD and s**t." That meant he had the strong product—"the fire." They also discussed that strong product as "casket" quality. Further, the evidence is clear as to at least one overdose death that he caused, and he himself refers extensively on recorded calls to the possibility, likelihood, and even the actuality of other overdoses—whether fatal or not. Defendant's dealing directly, and his participation in the

conspiracy more broadly, caused death or bodily injury, warranting upward departures or, alternatively, a high-end sentence under the § 3553(a) factors.

Defendant's history and character are also aggravating. Defendant's extensive criminal history shows persistent recidivism that places him off the criminal history charts—scoring 17 criminal history points without any increase for perpetrating this scheme during at least two different stays in jail. Not only did his prior sentences fail to deter him, but neither did multiple arrests during this investigation. Over the course of this investigation, Defendant encountered police repeatedly, and was even arrested three times before his federal arrest. Each time, he returned to dealing, including after being arrested twice in three days in January 2019.

## IV. CONCLUSION

For these reasons and those to be argued at the sentencing hearing, the government submits that the final PSR correctly calculates Defendant's guidelines ranges. For these reasons, and for those to be argued at the sentencing hearing concerning the sentencing factors under 18 U.S.C. § 3553(a), a life sentence is appropriate.

        Respectfully submitted,

        JUSTIN E. HERDMAN
        United States Attorney

By:   /s/ Elliot Morrison
      Elliot Morrison (OH: 0091740)
      Assistant United States Attorney
      United States Court House
      801 West Superior Avenue, Suite 400
      Cleveland, OH 44113
      (216) 622-3919
      (216) 522-8355 (facsimile)
      Elliot.Morrison@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on this day, December 2, 2019, a copy of the foregoing document was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  All other parties will be served by regular U.S. Mail.  Parties may access this filing through the Court's system.

/s/ Elliot Morrison
Elliot Morrison
Assistant U.S. Attorney